**UNITED STATES of America, Plaintiff,**

**v.**

**OLIN CORPORATION, Defendant.**

**Civil Action No. 95–0526–BH–S.**

United States District Court,
S.D. Alabama,
Southern Division.

May 20, 1996.

Eugene A. Seidel, U.S. Attorney's Office, Mobile, AL, Kathy Urbach, Assistant Regional Counsel, Environmental Protection Agency, Atlanta, GA, Robert A. Kaplan, Environmental Enforcement Section, U.S. Dept. of Justice, Washington, DC, Cheryl L. Smout, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Robert R. Homiak, U.S. Dept. of Justice, Environmental Enforcement Section, Environment & Natural Resources Div., Washington, DC, for plaintiff.

T. Bruce McGowin, Mobile, AL, Caine O'Rear, III, Mobile, AL, Arthur A. Rheingold, Chief Counsel, Olin Corporation, Stamford, CT, Michael W. Steinberg, Morgan, Lewis & Bockius, L.L.P., Washington, DC, Alex S. Karlin, Morgan, Lewis & Bockius, L.L.P., Washington, DC, for defendant.

## ORDER

HAND, Senior District Judge.

The United States filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, against defendant Olin Corporation ("Olin"), a Virginia corporation which owns and operates a chemical plant in McIntosh, Alabama, in southwest Washington County, approximately 25 miles east of the Mississippi state line and 75 miles north of the Gulf of Mexico. With the complaint, the parties filed a proposed consent degree. This court requested the parties to brief certain statutory and constitutional issues relating to CERCLA. For the reasons stated below, this court has determined that rather than signing the consent decree, it must dismiss the action both because 1) Congress did not clearly express its intent that the liability provision of CERCLA be retroactive, as required by *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) and 2) the application of CERCLA, at least on the facts of this case, violates the Commerce Clause as interpreted in *United States*

*v. Lopez,* 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

## I. THE COMPLAINT AND PROPOSED CONSENT DECREE

### A. The Olin Property in the Complaint

In its complaint, the Justice Department alleges that the Olin plant site in McIntosh, comprising 1,500 acres, contains two actionable sites. This action concerns only the first of two sites at the Olin property. "Site 1"[1] includes 20 acres on the southern edge of the property, on which an active chemical-production facility operates. This site contains a number of "solid waste-management units," both active and inactive, many of which have been closed and treated for the removal of hazardous substances.[2] To the north and northwest of the active chemical production facility are undeveloped tracts of land. To the west of the facility is a brine-well field. Four thousand feet east of the main plant area is a steep bluff which defines the edge of Site 2,[3] the natural basin.[4]

The government alleges that in 1952 Olin Mathieson began operating a mercury-cell chloralkali plant on Site 1 which generated and released wastewater containing mercury into Site 2 until 1974. This plant ceased operating in 1982.[5] In 1955, on Site 1, Olin Mathieson built a "crop-protection-chemicals" plant which discharged wastewater into Site 2 until 1974. This plant also ceased operating in 1982.[6] As a result of the operation of these two plants (1950's—late 1982), mercury and chloroform, which are alleged to be hazardous substances under 42 U.S.C. § 9601(14), were released into Site 1.

Most of the alleged contamination resulting from the operation of these two plants occurred prior to the effective date of CERCLA, December 11, 1980.[7] However, to the extent that both of these plants also operated after CERCLA's enactment, *i.e.,* from December 11, 1980, until late 1982, and to the extent that a threat of continuing releases at and from Site 1 continues, as the government alleges,[8] the government also seeks to recover CERCLA cleanup costs from Olin for post-enactment conduct.

In 1978, the company (whose name changed that year to Olin Corporation) built a diaphragm-cell caustic-soda/chlorine plant which it currently operates. There is no allegation in the complaint that the operation of this plant has any connection with the contaminants found on Site 1.

The Environmental Protection Agency ("EPA") listed the Olin plant site on the "national priorities list" in September 1984. *Cf.* 42 U.S.C. § 9605; 40 C.F.R. Part 300.

The complaint indicates that Olin conducted a "remedial investigation" of Site 1, completed in July 1993, and then a "feasibility study" of proposed responses to contamination at Site 1, completed in February 1994. In December 1994, the EPA executed its "record of decision" based on the remedial investigation and the feasibility study. The record of decision provides a remedy for the contamination of the alluvial aquifer which the agency contends is consistent with CERCLA and the national contingency plan.

For present purposes, the court accepts the allegations of the complaint as true and

1. The government labels Sites 1 and 2 as the "first operable unit" ("OU1") and the "second operable unit" ("OU2"), respectively. Site 1 includes all of the land except for the approximately sixty two acres designated as Site 2. *See* n. 3.

2. Remedial–Investigation Report at 1–5.

3. Site 2 consists of approximately 62 acres which form a natural basin lying east of the plant, surrounded by wetlands, and adjacent to the Tombigbee River. The government alleges that Olin (at the time known as Olin Mathieson) directed surface runoff containing hazardous substances into Site 2, which discharges into the Tombigbee River (the Tombigbee joins with the Alabama River to form the Mobile River, which flows into Mobile Bay and then the Gulf of Mexi-

co). However, the costs which the federal Environmental Protection Agency ("EPA") claims it has incurred and will incur for cleanup in Site 2, and any injunctions it may seek regarding this effort at Site 2, *are not part of this action.* The government plans to file a separate action regarding Site 2. *See* Complaint at p. 3, ¶ 8.

4. EPA Record of Decision at 5.

5. EPA Record of Decision at 8.

6. *Id.* at 10.

7. 42 U.S.C. § 9601(22).

8. Complaint, ¶ 18.

notes, in fairness, that Olin's answer admits many, while denying some, of them. For example, the defendant admits that there have been releases in the past, but denies that there is any threat of future release of hazardous substances. The defendant also denies any imminent and substantial danger to the public health or welfare, or the environment, because of actual or threatened releases from Site 1.

## B. The Proposed Consent Decree and Remedial–Investigation Report

With the complaint, the Justice department filed a proposed consent decree,[9] which both parties had signed. The government published notice thereof in the Federal Register to afford the public opportunity for comment. 603 Fed.Reg. 36309, 36309–10 (1995). When the government received no comment within 30 days, the parties jointly moved for the court to enter the consent decree. *See* 42 U.S.C. § 9622(d)(2).

The consent decree runs to 71 pages. It makes the defendant, its officers, directors, and anyone else associated with the defendant, liable for everything even remotely associated with the clean-up of Site 1, including insuring the automobiles the government uses in fulfilling and supervising the consent decree.

Although the EPA estimates the present value of the cost of compliance to Olin at $10,339,000,[10] the EPA has an almost unconstrained right to amend the consent decree. Of course, the defendant may appeal, but the defendant must direct the appeal to the EPA. The propriety of such procedures is beyond the scope of this inquiry, yet defense counsel has acknowledged that the consent decree gives the EPA *carte blanche* over the company treasury.

Olin has committed itself to performing the actions which the consent decree specifically requires, regardless of whether the court approves of the decree;[11] however, it has sought to do so under the supervision of the

Alabama Department of Environmental Management ("ADEM") rather than under the EPA.[12] The ADEM has sought the same. Twice in May 1994, the ADEM's director wrote to the EPA to request that the EPA allow the ADEM to implement the record of decision for Site 1 under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, and the Alabama Hazardous Waste Management and Minimization Act, Ala.Code §§ 22–30–1 *et seq.*, rather than CERCLA. In December 1994, the EPA's regional administrator in Atlanta, Georgia, wrote the ADEM director to convey the EPA's belief that it would be "premature at this time to defer" to the ADEM. The regional administrator stated that accepting the state's proposal would require modifying a permit under the Resource Conservation and Recovery Act, which would "add this additional layer of involvement and federal resources to the already complex situation." He further asserted that "continued implementation under CERCLA insures consistency and decreases the potential for conflict."[13] Be that as it may, consistency and the decreased potential for conflict are not necessarily synonymous with constitutionality.

Four days after rejecting the ADEM's request, the EPA issued its record of decision, the major portions of which require Olin to (1) pump and treat additional ground water, (2) upgrade and extend the existing caps over closed portions of Site 1, (3) increase monitoring of ground water, and (4) establish certain institutional controls.[14]

When the court inquired at oral argument why the defendant negotiated a settlement and entered into this "consent" decree, counsel for the defendant responded that it was "a pragmatic business judgment." It believed that "the fastest and most expedient way to get the work performed would be to simply go along with what the EPA sought here."[15] Olin wanted to complete the work and went along despite reservations about its

---

9. Attached to the consent decree are two appendices. Appendix A is the record of decision. Appendix B is a statement of work for Olin for Site 1.

10. EPA Record of Decision at 39.

11. Def.'s Mem. of Law at 2.

12. Tr. of Hr'g at 20.

13. Def.'s Mem. of Law at App. A.

14. EPA Record of Decision at Unnumbered Page 2.

15. Tr. of Hr'g at 20.

legality[16] and despite the government's rigid dictation of the terms and conditions it would accept.[17]

In addition to the consent decree, the government filed[18] a remedial-investigation report, prepared by Woodward–Clyde Consultants of Baton Rouge, Louisiana, in July 1993. The report documents remedial-investigation activities under an amended work plan and was completed under EPA supervision and ultimately with EPA approval. The objectives of the remedial investigation were (1) to investigate the nature, lateral extent, and vertical extent of contamination in order to ascertain the types, concentrations, and distributions of waste in all potentially affected media, such as the air, groundwater, soil, surface water, and sediment; (2) to determine the potential of the wastes to migrate beyond Site 1 and Site 2; and (3) to assess the current and potential risk to public health, welfare, and the environment.[19] Shortly after the government filed the remedial-investigation report, the parties jointly informed the court that they neither needed nor desired further discovery in this action.[20]

According to the remedial-investigation report, any contaminants still at Site 1 affect groundwater there mostly by migrating through the alluvial aquifer. This aquifer lies atop a miocene aquifer.[21] The remedial-investigation report indicates that there is little or no migration between the aquifers. The potential does exist for minimal migration along the casing of an enormous well on Site 1; *e.g.*, if the well were to develop a leak in the casing and/or a rupture in the annular seal. If so, the potential concentration of contaminants not only would be localized around the well, but also be negligible because the amount of water removed by this well is so great.

Wells established around the site to contain any outward flow of contaminants monitor the alluvial aquifer. Nothing shows that the alluvial aquifer carries water across any state lines or into any river or other transportation source that would take it across any state lines, nor is there any indication of transport of contaminants through the air across state lines.[22]

Indeed, the record reflects that any contamination at Site 1 is of such minimal proportions as not to constitute any hazard to the public. As stated in the EPA Record of Decision:

> The risk assessment indicates that only risks associated with potential future *on-site resident* exposures to contaminated groundwater and surface soils would not be within EPA's acceptable risk range. The chemicals of concern would pose unacceptable risks if the on-site groundwater were used as a source of potable water or if children living on the site were exposed to contaminated surface soils. *Future use of this site as a residential area is considered unlikely and* thus the proposed remedial goals are directed at protecting the groundwater for its maximum beneficial use.[23]

## C. Review of the Consent Decree

■ Notwithstanding the initial willingness of the defendant to enter into a "consent" decree, this court has a duty to examine a consent decree not only to determine

16. *Id.*

17. This is not an action in which anyone is trying to avoid a responsibility to the environment; Olin has agreed to perform the proposed remedial actions called for in the consent decree. The fact that Olin, despite its reservations about the fairness and even legality of the proposed consent decree, originally went along with the EPA is a vivid testament to the powerlessness felt by this citizen when forced to comply with various directives ordered by our administrative state.

18. Tab 15.

19. Remedial–Investigation Report at 1–3.

20. *See* tab 16, p. 2.

21. "Constituents are not expected to be present in the Miocene Aquifer beyond the lateral extent of hydrologic control of these active water supply wells. No migration towards the boundaries of OU–1 is anticipated as long as pumping of these wells continues at the current rates." Remedial–Investigation Report at 5–7.

22. At hearing, the government could only point to contaminants at *Site 2* which potentially traveled across state lines. *See* Tr. of Hr'g at 9–10, 16–17.

23. EPA Record of Decision at 23 (emphasis added).

whether its factual and legal determinations are reasonable, but also to ensure that the decree does not violate the Constitution, a federal statute, or the controlling jurisprudence. *E.g., Howard v. McLucas,* 871 F.2d 1000, 1008 (11th Cir.) *(citing United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring); *Cotton v. Hinton,* 559 F.2d 1326, 1330–31 (5th Cir.1977)), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989). The court, therefore, has made two requests for briefs, the first of which directed the parties to brief whether CERCLA, as applied in this case, is consistent with the Supreme Court's view of the Commerce Clause as recently explained in *United States v. Lopez,* 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). While both parties have responded to this issue, the defendant has also raised the issue of CERCLA's retroactivity. The defendant contends that Congress did not intend for CERCLA to be retroactive and that if it did, CERCLA violates the Due Process Clause and unconstitutionally delegates legislative power to the EPA. As a result of further direction from the court by order of December 29, 1995, the Justice Department has responded to the defendant's claims concerning retroactivity.

■ A frequently reaffirmed principle dictates that a court avoid deciding a constitutional issue if a case can be disposed of on non-constitutional grounds. *See, e.g., Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936) (Brandeis, J., concurring). Therefore, before considering the several constitutional issues, this court first addresses the statutory question of whether Congress intended to make CERCLA retroactive.

## II. CERCLA AND RETROACTIVITY

Although the retroactivity of CERCLA has been the subject of holdings in other circuits, the issue has not been squarely addressed by the Eleventh Circuit. In dicta, a panel of the Eleventh Circuit recently referred to CERCLA as being retroactive. *Virginia Properties Inc. v. Home Ins. Co.,* 74 F.3d 1131, 1132 (11th Cir., 1996). The issue of retroactivity, however, was not before that court.[24] In another CERCLA case before this court recently, the parties failed to raise the issue of CERCLA's retroactivity, *see Redwing Carriers, Inc. v. Saraland Apartments, Ltd.,* 875 F.Supp. 1545 (1995); in its decision, however, this court refused to apply certain regulations retroactively. 875 F.Supp. at 1565 ("Since there is no such clear intent in FIFRA, *see, e.g.,* 7 U.S.C. Secs. 136a(a), 136a(d)(2), 1361, the court declines to apply registration cancellation retroactively.").

Of those federal decisions which have directly addressed the issue of CERCLA's retroactivity,[25] none have declined to apply CERCLA on retroactivity grounds. Nevertheless, all of those cases were decided before the Supreme Court's decision in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483 (1994), on which the defendant rests its argument against retroactivity.[26]

**24.** Another reference to the retroactivity of CERCLA appears in an appendix to a 11th Circuit case, which is actually in a Georgia Supreme Court case appended to the per curiam opinion on a state contract issue. See *Claussen v. Aetna Casualty,* 888 F.2d 747, 751 (11th Cir.1989).

**25.** *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988); *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986); *HRW Systems v. Washington Gas,* 823 F.Supp. 318 (D.Md.1993); *City of Philadelphia v. Stepan Chemical,* 748 F.Supp. 283 (E.D.Pa.1990); *Kelley v. Solvent Co.,* 714 F.Supp. 1439 (W.D.Mich.1989); *O'Neil v. Picillo,* 682 F.Supp. 706 (D.R.I.1988); *United States v. Hooker Chemicals and Plastics,* 680 F.Supp. 546 (W.D.N.Y.1988); *United States v. Dickerson,* 640 F.Supp. 448 (D.Md.1986); *United States v. Ottati and Goss, Inc.,* 630 F.Supp. 1361 (D.N.H.1985); *Town of Boonton v. Drew Chemical,* 621 F.Supp.

663 (D.N.J.1985); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162 (W.D.Mo.1985); *United States v. Shell Oil,* 605 F.Supp. 1064 (D.Colo.1985); *Jones v. Inmont,* 584 F.Supp. 1425 (S.D.Ohio 1984); *United States v. South Carolina Recycling Disposal Co.,* 653 F.Supp. 984 (D.S.C.1984); *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823 (W.D.Mo.1984); *United States v. Price,* 577 F.Supp. 1103 (D.N.J.1983); *Ohio v. Georgeoff,* 562 F.Supp. 1300 (N.D.Oh.1983); *United States v. Wade,* 546 F.Supp. 785 (E.D.Penn.1982); *Cf. Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp.,* 948 F.2d 1507 (9th Cir.1991); *O'Neil v. Picillo,* 883 F.2d 176 (1st Cir.1989); *In the Matter of Penn Central,* 944 F.2d 164 (3rd Cir.1991); *United States v. Kramer,* 757 F.Supp. 397 (D.N.J.1991).

**26.** The defendant cites and seems to summarize an article entitled, "A Public Policy Essay: Superfund Retroactivity Revisited," by George

**1508**

### A.

The Justice Department has responded somewhat cavalierly to the issue of CERCLA's retroactivity, contending the matter is "well settled" and unaffected by *Landgraf:*

> Every court to face CERCLA retroactivity challenges has rejected the arguments advanced here. Indeed, courts have uniformly held that (1) Congress clearly and unequivocally intended retroactive application of CERCLA and; (2) such a liability scheme is rationally related to a legitimate governmental interest. The Supreme Court's decision in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) announces no new constitutional rules, and in no way impacts this case law.

*See* Pl's Mem. on the Retroactivity of CERCLA and Due Process Issues, p. 2. To begin with, Justice errs in claiming that the lower federal courts have "uniformly held that (1) Congress clearly and unequivocally intended retroactive application of CERCLA." In fact, not all the courts which have applied CERCLA to pre-enactment conduct have agreed that it is retroactive,[27] and those which have actually analyzed the retroactivity issue have differed on whether Congress was acting "clearly and unequivocally."[28] More importantly, Justice's observation that

*Landgraf* "announces no new constitutional rules" fails to assist this court with what is a significant non-constitutional decision.[29] Written against the backdrop of several constitutional issues, the *Landgraf* holding addresses a rule of statutory construction. Justice cannot credibly contend that "[t]he result in Landgraf is unremarkable." [30]

It is understandable that Justice would attempt to dismiss *Landgraf* so casually.[31] *Landgraf* certainly demolishes the interpretive premises on which prior cases had concluded CERCLA is retroactive. *Landgraf* does so in the course of attempting to clarify confusion regarding the interpretive rules applicable to retroactivity:

> Our precedents on retroactivity left doubts about what default rule would apply in the absence of congressional guidance, and suggested that some provisions might apply to cases arising before enactment while others might not. Compare *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) with *Bradley v. Richmond School Bd.,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

*Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1495. In reaffirming the traditional presumption against retroactive legislation, *Landgraf* disapproves language in *Bradley* which had ap-

---

Clemon Freeman, Jr., published in the American Bar Association's *Business Lawyer,* vol. 50 at 663 (Feb., 1995) (hereinafter, "Freeman"). The author, a practicing attorney, who was a member of the Superfund Section 301(e) Study Group, a congressional advisory committee on the Act, and who has participated in litigation on the retroactivity issue, *see United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986), argues that neither the text nor legislative history demonstrate that Congress intended CERCLA to be retroactive. He has previously made this argument. *See Id.* notes 16–18, and accompanying text. The author contends:

> If the question were before a federal court today in a case of first impression, Superfund's liability provision, section 107(a), could not meet the test of statutory construction set forth in Justice Stevens' majority opinion in *Landgraf.* Neither the text of the statute not its legislative history could sustain retroactive application. Nor could section 107(a) meet the more restrictive test of Justice Scalia's concurrence, which looked only at the text of the statute.

"Freeman" at 664–665 (footnotes omitted).

**27.** *See United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984 (D.S.C.1984) *aff'd in part and vac. in part sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir. 1988); *Cf. United States v. Diamond Shamrock Corp.,* [1982] 1981 WL 137997 (N.D.Ohio May 29, 1981); *United States v. Price,* 523 F.Supp. 1055 (D.N.J.1981), aff'd, 688 F.2d 204 (3d Cir. 1982). *South Carolina Recycling* concluded that the act was not "retroactive," but applied CERCLA on the theory that because the previous disposal continued to cause or threatened to cause releases after the Act's effective date.

**28.** *See* notes 31–34, *infra.*

**29.** *See* n. 38, *infra.*

**30.** "Pl's Mem. on the Retroactivity of CERCLA and Due Process Issues" at 4.

**31.** See *e.g. Ohio v. Georgeoff,* 562 F.Supp. 1300, 1311 (N.D.Ohio, 1983) ("[T]he Court is unable to declare that the statute evidences the 'imperative character' required to overcome the presumption against retroactivity").

peared to reverse that traditional presumption.

*Bradley* allowed an award of attorneys' fees for work done prior to the effective date of the statute providing for attorneys' fees. The Supreme Court stated it was doing so "on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." 416 U.S., at 711, 94 S.Ct., at 2016. The applicability of this language was severely limited by *Landgraf:*

> Although the language suggests a categorical presumption in favor of application of *all* new rules of law, we now make it clear that *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely "retroactive" effect.

*Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1503 (emphasis in the original).

An early and influential case finding CERCLA retroactive, *Ohio v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio, 1983), did exactly what *Landgraf* disapproves. *Georgeoff* began quite appropriately by "initially determin[ing] the standard to be applied in determining whether a statute should be applied retroactively." 562 F.Supp. at 1306. While it acknowledged an "historical[ ] ... presumption favoring a prospective only application of a statute",[32] the court otherwise approved of[33] and seemed to apply a pre-

sumption in favor of retroactivity. The premises for the decision in *Georgeoff* were disapproved in and are no longer tenable after *Landgraf.* As a result, *Georgeoff* and the cases which rely on its analysis,—and which do not do their own analysis—cannot be considered persuasive.

Besides *Georgeoff,* only two other cases actually do analyze the issue of retroactivity; the rest of the cases basically rely on one or more of these three cases and other cases which cite these cases. Those other two cases which do their own analyses are *United States v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo., 1985) and *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726 (8th Cir., 1986), both of which also cite *Georgeoff* with approval. *See* 605 F.Supp. at 1072 and 810 F.2d at 733. Unlike *Georgeoff,* neither case explains how it is applying the presumption against retroactivity; but like *Georgeoff,* both cases demonstrate little regard for the presumption. Following an analysis unlike that of *Landgraf*[34] and after quoting *Georgeoff, Id.* at 1072, *Shell Oil* concludes that CERCLA is "unavoidably retroactive." *Id.* at 1073. It does so on the basis of CERCLA's "general purpose and scheme."[35] Under *Landgraf,* however, the fact "that retroactive application of a new statute would vindicate its purpose more fully ... is not sufficient to rebut the presumption against retroactivity." 511 U.S. at ——, 114 S.Ct. at 1507–8. Other than its discussion of "general purpose and scheme," *Shell Oil* does not explain precisely what overrides the presumption against retroactivity.[36] As for *Northeastern,* on which

---

**32.** 562 F.Supp. at 1306.

**33.** In footnotes, the court explained its view of the presumption:

> Since the principal basis for the presumption against retroactivity is the threat of raising a constitutional issue, the reduction of that constitutional issue must necessarily reduce the need to interpret CERCLA to avoid raising that constitutional issue. *The weight of the presumption therefore being reduced,* a more lenient approach in reviewing claims that the presumption has been over-ridden may be appropriate. 562 F.Supp. at 1306, n. 7. (emphasis added)

> ....

> *After Thorpe and Bradley, the presumption against retroactivity has arguably been changed to a presumption in favor of retroactivity. That presumption can only be over-ridden where there is a clear legislative directive to limit the statute to a prospective application* or the change in

law would cause manifest injustice to the party adversely affected. *Id.* at 1307, n. 9. (emphasis added).

**34.** "Before turning to a close analysis of specific statutory provisions and their accompanying legislative history, I will review the general purpose and scheme of CERCLA," 605 F.Supp. at 1069.

**35.** *See* n. 33, *supra.*

**36.** Additionally, both *Shell Oil* and *Northeastern* also rely upon an argument disapproved of in *Landgraf.* Specifically, these two cases argue that the affirmative preclusion of recovery for damages occurring before CERCLA's enactment in § 107(f), the natural resource liability section, indicates congressional intent for the other liability sections to operate retroactively. *See Shell Oil,* 605 F.Supp. at 1076 and *Northeastern,* 810 F.2d at 736. Noting that, "it would be surprising

Justice relies, the case treats the presumption itself rather lightly, devotes only one sentence to the statutory language, relies on *Shell Oil* and *Georgeoff* among other cases, and offers one paragraph about the "statutory scheme." [37]

It is understandable that, prior to *Landgraf,* lower federal courts would have tended to minimize the importance of the presumption against retroactivity given some Supreme Court precedents. *Landgraf* reflects the different views on the Court about whether some of its precedents, in particular *Bradley v. Richmond School Bd.,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1969) and a case on which it relies, *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), have been consistent with other Supreme Court precedents. The dissenting opinion in *Landgraf* remarks on the majority's "eagerness to resolve the 'apparent tension' ... between *Bradley v. Richmond School Bd.* ... and *Bowen v. Georgetown University Hospital*", 511 U.S. at ——, 114 S.Ct. at 1508 (Blackmun, J., dissenting) (citations omitted). The concurring opinion simply says that *Bradley* and *Thorpe* "invented an utterly new and erroneous rule." *Id.* at ——, 114 S.Ct. at 1496 (Scalia, J., concurring). On the one hand, the majority "begin[s] by noting that there is no tension between the *holdings* in *Bradley*

for Congress to have chosen to resolve [the retroactivity issue] through negative inference," the *Landgraf* Court found a remarkably similar argument to be unpersuasive. 511 U.S. at ——, 114 S.Ct. at 1493–1494.

**37.** The courts' discussion is as follows with reference to the presumption itself emphasized:

The district court correctly found Congress intended CERCLA to apply retroactively. *Id.* at 839. *We acknowledge there is a presumption against the retroactive application of the statutes. See United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). We hold, however, that CERCLA § 302(a), 42 U.S.C. § 9652(a), is "merely a standard 'effective date' provision that indicated the date when an action can first be brought and when the time begins to run for issuing regulations and doing other future acts mandated by the statute." *United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1075 (D.Colo. 1985); *cf. Von Allmen v. Connecticut Teachers Retirement Board,* 613 F.2d 356, 359–60 (2d Cir.1979) (veterans statute).

Although CERCLA does not expressly provide for retroactivity, it is manifestly clear that Congress intended CERCLA to have retroactive effect. The language used in the key liability provision, CERCLA § 107, 42 U.S.C. § 9607, refers to actions and conditions in the past tense: "any person who at the time of disposal of any hazardous substances owned or operated," CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), "any person who ... arranged with a transporter for a transport for disposal," CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), and "any person who ... accepted any hazardous substances for transport to ... sites selected by such person," CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4). *See, e.g., United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 220 (W.D.Mo.1985); *United States v. Shell Oil Co.,* 605 F.Supp. at 1069–73; *United States v. South Carolina Recycling & Disposal, Inc.* [653 F.Supp. 984] 20 Env't Rep. Cases (BNA) 1753, 1760–62 (D.S.C.1984) (The court in *United States v. South Carolina Recycling & Disposal, Inc.,* [653 F.Supp. 984] 20 Env't Rep.Cases (BNA) 1753, 1760 (D.S.C. 1984), noted CERCLA does not apply "retroactively" because it does not impose liability for past conduct; rather, CERCLA imposes liability upon those parties responsible for causing certain conditions, that is, the release or threatened release or hazardous substances, that are the *present or future* results of their *past* actions.); *United States v. A & F Materials Co.,* 578 F.Supp. at 1259; *United States v. Price,* 577 F.Supp. 1103, 1111–12 (D.N.J. 1983); *Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1312 (N.D.Ohio 1983); *United States v. Outboard Marine Corp.,* 556 F.Supp. 54, 57 (N.D.Ill.1982); *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1113–14 (D.Minn.1982); *see generally Developments in the Law—Toxic Waste Litigation,* 99 Harv.L.Rev. 1498 (1986) (*Developments* ).

Further, the statutory scheme itself is overwhelmingly remedial and retroactive. CERCLA authorizes the EPA to force responsible parties to clean up inactive or abandoned hazardous substance sites, CERCLA § 106, 42 U.S.C. § 9606, and authorizes federal, state and local governments and private parties to clean up such sites and then seek recovery of their response costs from responsible parties, CERCLA §§ 104, 107, 42 U.S.C. §§ 9604, 9607. In order to be effective, CERCLA must reach past conduct. CERCLA's backward-looking focus is confirmed by the legislative history. *See generally,* H.R.Rep. No. 1016, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119 (CERCLA House Report). Congress intended CERCLA "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *Id.* at 22, 1980 U.S.Code Cong. & Ad.News at 6125.

810 F.2d at 732–33 (emphasis added).

and *Bowen*." *Id.* at ——, 114 S.Ct. at 1496 (emphasis in the original). Later, however, the majority isolates and limits the troublesome language in *Bradley*, quoted above, which created the confusion about the strength of the presumption against retroactivity. Whether *Bradley* actually is or is not at odds with pre and post-precedent need not concern this court. It suffices to recognize that, contrary to the assertion by Justice, *Landgraf* does at least clarify the analysis of retroactivity and, therefore, does "impact this case." [38]

### B.

The majority opinion in *Landgraf* sets forth an analysis which, as here summarized, requires a court 1) to determine a) whether Congress has expressly stated the statutes reach and b) if not, whether the text and legislative history have "clearly prescribed" Congress' intent to apply the provision retroactively; · 2) if not, to determine whether the provision actually has "retroactive effect on the party or parties in the litigation;" and 3) if so, to apply the traditional presumption against retroactivity—absent a clear congressional intent to the contrary.

The majority opinion's approach breaks down as follows:

1) In the last sentence of Part II of the opinion, the majority says: "Our first question, then, is whether the statutory text . . . manifests an intent that the 1991 Act should be applied to cases that arose and went to trial before its enactment." 511 U.S. at ——, 114 S.Ct. at 1492. What follows in Part III of the opinion, 511 U.S. at ——, 114 S.Ct. at 1493–96, is an analysis of the arguments based on the text and legislative history. At the end of this section, the majority determines: "[i]n the absence of the kind of unambiguous directive found in Sec. 15 of the 1990 bill [which explicitly provided for retroactivity], we must look elsewhere for guidance on whether Sec. 102 applies to this case." 511 U.S. at ——, 114 S.Ct. at 1496.

2) Part IV of the opinion, —— U.S. at ——–——, 114 S.Ct. at 1496–1505, discusses the presumption against retroactivity. The majority notes the " 'apparent tension' " between the different canons of construction found in *Bradley* as opposed to other Supreme Court precedents. *Id.* at ——, 114 S.Ct. at 1496. The Court concludes this section with the following framework for analysis:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has *expressly* prescribed the statutes' reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains *no such express command,* the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at ——, 114 S.Ct. at 1505. (emphasis added).

3) In Part V of the opinion, 511 U.S. at ——–——, 114 S.Ct. at 1505–1508, the majority "ask[s] whether, given the absence of guiding instructions from Congress, Sec. 102 of the Civil Rights Act of 1991 is the type of provision that should govern cases arising before its enactment." 511 U.S. at ——, 114 S.Ct. at 1505. They find the new damages remedy to have a retroactive effect and conclude it "is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent," 511 U.S. at ——, 114 S.Ct. at 1506. The section proceeds without reconsidering its earlier discussion of congressional intent—

---

**38.** *See also* Leonard Charles Presberg, *The Civil Rights Act of 1991, Retroactivity, and Continuing Violations,* 28 U.Richmond L.Rev. 1363, —— (1994) ("Prior to *Landgraf*, the Court had utilized two conflicting presumptions regarding the retroactivity of civil legislation."); Nelson Lund, *Retroactivity, Institutional Incentives, and the Politics of Civil Rights,* 1995 Pub.Int.L.Rev. 87

(1995); Duncan B. Hollis, Employment Discrimination Law, *Statutory Retroactivity,* 36 B.C.L.Rev. 373, 385 (1995) ("Beyond the scope of § 1981 cases, however, *Rivers*, in conjunction with *Landgraf*, does much to resolve the confusion surrounding what test a court should apply when a case implicates a statute enacted after the violative conduct occurred").

other than to reject as insufficient to overcome the presumption against retroactivity the argument that "retroactive application of a new statute would vindicate its purpose more fully" 511 U.S. at ——, 114 S.Ct. at 1507 (footnote omitted)—to conclude that they "have found no clear evidence of congressional intent that Sec. 102 of the Civil Rights Act of 1991 should apply to cases arising before its enactment." 511 U.S. at ——, 114 S.Ct. at 1508.

In the framework of analysis as quoted above in 2), the first step involves only a determination of whether Congress has made an express statement concerning retroactivity; other evidence of "clear congressional intent" is left to step three. In the opinion itself, however, the Court considers both express and other evidence of congressional intent in the first step. As reflected from the quotes from Parts II and III of the opinion, see 1), the Court does not clearly differentiate between express language and other clear language of intent from the statute or legislative history. While it does not seem to matter whether the discussion of intent is confined to step one or divided between step one and step three, the analysis here follows what *Landgraf* in fact does.

**1. Has Congress Expressed Its Intent On CERCLA Retroactivity?**

CERCLA contains no language explicitly stating it is retroactive.[39] Under language in some Supreme Court opinions, that failure would be fatal for retroactivity. *United States v. Heth*, 3 Cranch 399, 414, 2 L.Ed. 479 (1806). (Cushing, J.) ("[I]t [is] unreasonable in my opinion, to give the law a construction which would have such a retrospective effect, unless it contained express words to that purpose.") While *Landgraf* demonstrates a preference for express language regarding retroactivity[40] and seems to warn Congress about the danger of not being explicit,[41] its discussion of other (i.e., non-express) statutory language and legislative history establishes that these should be considered in determining congressional intent.

**a) Non–Express Statutory Language.**

In resolving retroactivity issues, *Landgraf* instructs that the answer may vary among provisions within an act. 511 U.S. at —— and ——, 114 S.Ct. at 1494 and 1505. Accordingly, the analysis focuses on the particular provisions of CERCLA, at issue in the complaint, Sections 106(a)[42] and 107(a).[43] Under Section 106(a) the government seeks injunctive relief in the first claim of the complaint. Although injunctive relief is ordinarily prospective, when it requires a party to spend funds related to actions taken prior to CERCLA's enactment, such relief is nevertheless retroactive. *See Georgeoff*, 562 F.Supp. at 1303–05. Thus to the extent that

---

**39.** As Justice and the other parties in *Georgeoff* agreed, "there are no unequivocal statements in the [CERCLA] statute indicating a Congressional intent to make it apply retroactively." 562 F.Supp. at 1309.

**40.** See discussion in B., *supra* and n. 41, *infra*.

**41.** Although the passage of the 1990 bill may indicate that a majority of the 1991 Congress also favored retroactive application, even the will of the majority does not become law unless it follows the path charted in Article I, § 7, cl. 2 of the Constitution. See *INS v. Chadha*, 462 U.S. 919, 946–951, 103 S.Ct. 2764, 2781–2784, 77 L.Ed.2d 317 (1983).

**42.** Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), provides in pertinent part:

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

**43.** Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in pertinent part:

(1) the owner and operator of a vessel or a facility; [and]
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . .
shall be liable for—
(A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan. . . .

the government's claims under 106(a) and 107(a) relate to actions taken prior to the effective date of CERCLA, they involve the issue of retroactivity.

The Justice Department devotes little attention to statutory language as evidence of congressional intent. To the extent it does, Justice's brief relies on *Northeastern's* observation that "[t]he language used in the key liability provision, CERCLA § 107 ... refers to actions and conditions in the past tense." *Northeastern*, 810 F.2d at 733. *Georgeoff*, after a more extensive analysis, finds the use of the past tense not dispositive.[44] Even while finding other terms supportive of retroactivity, *Georgeoff* states that the statutory provisions are insufficient to overcome the presumption of retroactivity.

Despite these statutory arguments, the Court is unable to declare that the statute evidences the "imperative character" required to overcome the presumption against retroactivity. Regardless, these provisions provide some evidence that Congress intended CERCLA to apply retroactively. The Court, therefore, will consider these statutory terms as indicia, but not dispositive indicia, of a Congressional intent to allow retroactive application of CERCLA.

562 F.Supp. at 1311. *Shell Oil* agrees with *Georgeoff*.[45] *Georgeoff's* and *Shell Oil's* conclusion that the statutory language in CERCLA is not sufficient to establish retroactivity is persuasive. Although *Northeastern* arguably[46] reaches a contrary conclusion, it does so without conducting nearly as extensive an analysis as done in *Georgeoff*. This court concludes, therefore, that the language of section 107 provides "no clear evidence of

Congressional intent," as required by *Landgraf*, that CERCLA's liability provisions be given retroactive effect.

Section 106 contains no language indicating congressional intent to authorize relief that is retroactive.[47] If anything, the language suggests the very argument, later made by Justice, that CERCLA liability is not "retroactive." The pertinent language of § 106 borrows from law on the abatement of nuisance; it refers to "an imminent and substantial endangerment to the public health or welfare or the environment" and provides "such relief as may be necessary to abate such danger or threat."[48] *Georgeoff* records Justice's unsuccessful attempt to argue that, "although it reaches pre-enactment conduct, legislation designed to alleviate a continuing public nuisance does not act retroactively." 562 F.Supp. at 1304. *United States v. So. Carolina Recycling and Disposal Inc.*, 653 F.Supp. 984 (D.S.C., 1984), on the other hand, adopts that argument.[49] As discussed below, *Landgraf* now precludes such attempts to avoid the issue of retroactivity. The fact that in the early cases Justice thought it necessary to argue, at least in the alternative, that CERCLA is not retroactive certainly indicates Justice's initial concern that courts might not find a clear congressional intent that CERCLA be applied "retroactively."

### b) Legislative History.

CERCLA itself has almost no legislative history.

Although Congress had worked on "Superfund" cleanup of toxic and hazardous waste bills, and on parallel oil spill bills for

---

44. *See generally* 562 F.Supp. at 1309–11. "It will be unnecessary to construe the word 'accepted' to apply to pre-enactment conduct to give it effect. 'Accepted' may apply to pre-enactment conduct, but the Statute does not require such an application." *Id.* at 1310.

45. "I find and conclude that congressional intent to either impose or withhold liability for response costs incurred before CERCLA cannot be divined from the verb tenses in § 107(a)." 605 F.Supp. at 1073.

46. Despite the language cited in n. 37, *supra*, *Northeastern* goes on to follow the *Shell Oil* anal-

ysis and cites approvingly that court's finding that congressional intent to impose liability for pre-enactment response costs cannot be divined from the verb tenses in § 107(a). *See* 810 F.2d at 735.

47. See 106(a) quoted in n. 42, *supra*.

48. *Id.*

49. "Although liability under CERCLA is premised in part upon conduct which occurred prior to CERCLA's enactment in 1980 this court does not consider CERCLA 'retroactive' in the constitutional sense as applied to the facts of this case." 653 F.Supp. at 996.

over three years, *the actual bill which became Public Law No. 96–510 had virtually no legislative history at all,* because the bill which became law was hurriedly put together by a bipartisan leadership group of Senators—with some assistance of their House counterparts—introduced and passed by the Senate in lieu of all pending measures on the subject. It was then placed before the House, in the form of a Senate amendment of the earlier House bill. It was considered on December 3, 1980, in the closing days of the lame duck session of an outgoing Congress. It was considered and passed, after very limited debate, under a suspension of the rules, in a situation which allowed for no amendments. Faced with a complicated bill on a take-it-or-leave-it basis, the House took it, groaning all the way.

Frank P. Grad, *Treatise on Environmental Law* Sec. 4A.02[2][a], at 4A–51 (1994). (footnote omitted) (Hereinafter, "Grad") (emphasis added).

The unusual lack of legislative history, as reflected by the failure even to produce a House—Senate Conference Report, is attributable to "[t]he delicate nature of the compromise" which led to passage, according to the Preface to the Congressional Research Service Legislative History.[50] Much of what passes for legislative history of CERCLA, therefore, comes from "bills introduced which contributed to some extent to the final act."[51]

In *Landgraf,* the Supreme Court does consider a prior bill as part of its review of the legislative history. The Court places some weight on the fact that a bill vetoed in the previous year had explicitly provided for retroactivity. The legislative history considered in *Landgraf* comes not from committee reports, but from the language of the prior bill itself. The fact that the later enacted legislation had no such provision prompts the Court to infer: "it seems likely that one of the compromises that made it possible to enact the 1991 version was an agreement *not* to include the kind of explicit retroactivity com-

mand found in the 1990 bill," 511 U.S. at ——, 114 S.Ct. at 1495 (emphasis in the original).

As acknowledged in *Georgeoff,* "the precise issue of retroactivity ... was not addressed in Congressional debates," 562 F.Supp. at 1311, including debate on prior bills. *Id.* Under *Landgraf,* that fact would seem to be nearly fatal to any attempt to overcome the presumption against retroactivity.

The Justice Department attempts to distinguish CERCLA from the civil rights statute considered in *Landgraf* because no bill prior to CERCLA explicitly provided for retroactivity. *See* "Pl's Mem. on Retroactivity" at 4–5. That fact, however, does not strengthen the case for retroactivity. It only means that what Justice and other courts have labeled the legislative history of CERCLA may not be as clear as was the legislative history of the Civil Rights Act considered in *Landgraf.* It still remains for Justice to demonstrate that the legislative history does contain clear intent of CERCLA's retroactivity. In attempting to do so, Justice contends that the "history, as analyzed by the courts, demonstrates unequivocally that Congress was concerned about past, pre-enactment acts of disposal." "Pl's Mem." at 8.

The argument of Justice, relying as it does on past cases, fails to overcome the presumption against retroactivity because those prior cases do not follow the analysis of *Landgraf* and because they find clarity in legislative history which does not exist. Many of the past cases are unclear about two things which are distinguished in *Landgraf:* congressional intent and retroactive effect. As discussed below, *Landgraf* struggles with the term "retroactive." The majority excludes certain statutes from the presumption against retroactivity,[52] specifically procedural and jurisdictional statutes. See 511 U.S. at —— —— ——, 114 S.Ct. at 1501–02. Approving of Justice Story's discussion in *Society for Propagation of the Gospel v. Wheeler,* 22

---

**50.** "A Legislative History of the Comprehensive Environmental Response Compensation, and Liability Act of 1980 (Superfund), Public Law 96–510." Comm. on Environment and Public Works, U.S. Senate, 97th Cong., 2d Sess. Vol. 1 at VII.

**51.** Grad at 4A–51.

**52.** "Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations." 511 U.S. at ——, 114 S.Ct. at 1501.

F.Cas. 756 (No. 12,156) (CCDNH 1814), the majority says:

A statute does not operate "retroactively" merely because it is applied in a case arising from conduct antedating the statute's enactment ...

511 U.S. at ——, 114 S.Ct. at 1499.

In other words, the fact that legislation might have retroactive effect does not necessarily mean that Congress clearly intended that it be so applied.

In searching the legislative history, some courts have placed weight on sources that have little no value. As two commentators write: "[t]he available reports pertaining to prior versions of the legislation are of little value in interpreting the statute—CERCLA, as enacted, differed significantly from previous proposals." Allan J. Topol and Rebecca Snow, *Superfund Law and Procedure* § 1.1. at 5 (St. Paul, West; 1992).

The most that can be said from the legislative history is that Congress left many questions, including retroactivity, as open ones to be decided later. Like *Landgraf,* the circumstances surrounding passage of CERCLA strongly suggest that the failure expressly to prescribe the reach of the statute was deliberate on Congress' part.

It would have been a simple matter for Congress to have included a provision within the Act providing that liability would be imposed retroactively. Given the undoubted Congressional awareness of an existing problem, this omission takes on special importance. There can be no question that Congress was aware that the issue of retroactivity could arise. Yet, Congress failed to make this statement.

*Georgeoff,* 562 F.Supp. at 1309.

The political circumstances suggest why there was little actual legislative history and why Congress left many issues deliberately ambiguous.[53]

In 1980, CERCLA emerged from the lame duck session of Congress after President Carter had been defeated and former Governor Reagan had yet to assume the presidency. Its language was derived mainly from S. 1480, 99th Cong., 2d Sess. (1980), a bill that had been reported from the Senate Committee on Environment and Public Works but that had little hope for passage in its complete form. A group of approximately 25 to 30 senators, with assistance from House members and the outgoing Administration (at one point including President Carter himself), and crafted new legislative language to paper over policy disputes on which there was no consensus. Because many such disputes remained after these negotiators finished their deliberations, floor debate in the Senate often contain rival explanations of the same provisions of CERCLA.

Alfred R. Light, *CERCLA Law and Procedure Compendium* (BNA; Washington, D.C., 1992) at 1–1.

The circumstances explain why Congress decided not to decide many issues, leaving them for others—the EPA and the courts—to decide. The fact that CERCLA includes a legislative veto, *see* 42 U.S.C. § 9655, since determined to be unconstitutional, *see INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), suggests that members of Congress may not have been as concerned as they should have been about a number of issues, including retroactivity, because they assumed incorrectly that Congress has the power to "fix it" later without concern about a presidential veto. Whatever the reasons, the legislative history lacks the clear con-

---

**53.** As Senator Randolph stated in part in explaining the liability provisions of the Compromise:

The liability regime [Sec. 109] in this substitute contains some changes in language from that in the bill reported by the Committee on Environment and Public Works. The changes were made in recognition of the difficulty in prescribing in statutory terms liability standards which will be applicable in individual cases. The changes do not reflect a rejection of the standards in the earlier bill.

Unless otherwise provided in this act, the standard of liability is intended to be the same as that provided in section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321). I understand this to be a standard of strict liability.

It is intended that issues of liability not resolved by this act, if any, shall be governed by traditional and evolving principles of common law. An example is joint and several liability, Any reference to these terms has been deleted, and the liability of joint tortfeasors will be determined under common or previous statutory law.

gressional intent to make CERCLA liability retroactive.

█ Given that the language—express or otherwise—and the legislative history—broadly and narrowly understood—fail to demonstrate a clear congressional intent for retroactivity, *Landgraf* requires that the presumption against retroactivity be applied if the statute is one to which that presumption applies.

### 2. Does CERCLA Have Retroactive Effect?

*Landgraf* does not simply ask: is the statute retroactive? Framing the question that way, as have a number of the lower federal courts, reduces the analysis to a matter of labeling rather than distinguishing between the effect of the statute and the intent of Congress as does *Landgraf.*[54] A few of the early cases manipulate the label "retroactive" apparently as a way of avoiding the issues of congressional intent and constitutionality. Thus *United States v. South Carolina Recycling Disposal Co.,* 653 F.Supp. 984 (D.S.C., 1984), *aff'd in part and vac. in part sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir., 1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), concludes that considering pre-enactment conduct does not make CERCLA liability "retroactive" because the statute actually imposes liability for the post enactment releases or threatened releases. Although the Justice Department now contends that CERCLA is clearly retroactive, early cases reflect that Justice made the

argument that CERCLA is not retroactive. *See e.g., Georgeoff,* 562 F.Supp. at 1304.[55]

Under the *Landgraf* analysis, CERCLA liability certainly has "retroactive effect" because as applied in this and many other cases it easily falls within the explanatory language of that term. That is to say, the Justice Department's attempt in this case to impose liability under § 107(a) largely on actions occurring prior to the statute's effective date "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." 511 U.S. at ——, 114 S.Ct. at 1505. What *Landgraf* said about compensatory damages can be said about the financial liabilities under CERCLA for pre-enactment conduct: "[t]he new damages remedy in Sec. 102, we conclude, is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent." 511 U.S. at ——, 114 S.Ct. at 1506.

### 3. Should the Presumption Against Retroactivity be Applied?

In the third step of the analysis, *Landgraf* asks "whether, given the absence of guiding instruction from Congress, the [particular section of the act] is the type of provision that should govern cases arising before its enactment." The Court does not ask generally whether the act is retroactive, but focuses on the particular section. The opinion then distinguishes between a procedural provision of that section (jury trial right) which would "presumably apply to cases ... re-

---

**54.** 511 U.S. at ——, 114 S.Ct. at 1499.

Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

**55.** 562 F.Supp. at 1304 (emphasis added).

The Court next turns to a consideration of Justice's position. Under the liability provisions of CERCLA, 42 U.S.C. § 9607(a), a "release or threatened release" of hazardous wastes is required to trigger liability. Justice argues that the release at the Dump is a continuing release of hazardous waste triggering

liability at any time before the wastes' removal. Because the waste has yet to be removed, BFI has engaged in conduct taking place after the enactment of CERLCA. Imposition of liability, therefore, would not be retroactive because at least some of the facts giving rise to the liability are based on events taking place after the enactment of CERCLA.

*In support of this argument, Justice cites a number of cases which it argues hold that legislation designed to alleviate a continuing public nuisance does not act retroactively. Samuels v. McCurdy,* 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1925); *Chicago & Alton Railroad Company v. Tranbarger,* 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204 (1915); *City of Bakersfield v. Miller,* 64 Cal.2d 93, 48 Cal.Rptr. 889, 410 P.2d 393 (1966); *People of Illinois v. Jones,* 329 Ill.App. 503, 69 N.E.2d 522 (4th Dist.1946).

gardless of when the underlying conduct occurred," [56] and its punitive and compensatory damages provisions. Recognizing that "[r]etrospective imposition of punitive damages would raise a serious constitutional question", *Id.* at ——, 114 S.Ct. at 1505, the Court avoids that constitutional question by interpreting the punitive damages provision not to be retroactive.[57] The provision "authorizing recovery of compensatory damages is not easily classified," *id.*, according to the Court, because the conduct itself was already unlawful—only the remedy was new—and also because compensatory damages are not punitive. Despite these differences, *Landgraf* applies the presumption against retroactivity even to the compensatory damages provision.

The CERCLA provision, § 107(a), as applied in this case falls somewhere between the punitive damage and the compensatory damage provisions considered in *Landgraf.* In this case, punitive damages are not sought. Nevertheless, § 106 does provide for fines for failure to comply with an executive branch abatement order; such fines are clearly punitive. Section 107(c)(3) also authorizes punitive, treble damages. The EPA uses the threat of punitive damages as a negotiating tool.[58] Given the very real threat of punitive damages, CERCLA retroactivity poses very nearly the same *"ex post facto"* danger referred to in *Landgraf.* 511 U.S. at —— – ——, 114 S.Ct. at 1505–06. According

to *Landgraf,* a provision for punitive damages should not be construed as retroactive unless the language forces that conclusion because the court must then confront substantial constitutional questions which follow.

Regardless of the threat of punitive damages, retroactive CERCLA liability is more egregious than the compensatory relief which the Court refused to apply retroactively in *Landgraf.* In the instant and many other cases, liability under CERCLA would require compensation for actions which when taken violated no federal or state law. At least as to the compensatory damages remedy sought in *Landgraf,* it could be said that retroactivity involved no new legal standard concerning the conduct itself.[59] Nevertheless, even on the compensatory damages issue *Landgraf* says, "it is the kind of provision that does not apply in the absence of clear congressional intent." Certainly, under *Landgraf* principles, CERCLA liability is the kind that does not apply retroactivity without clear congressional intent.

As discussed above, pre-*Landgraf* cases addressing CERCLA retroactivity are unreliable. Among these cases, Justice places particular reliance on *Northeastern* which characterizes CERCLA as "overwhelmingly remedial and retroactive" and as having a "backward focus." Such labels only confuse the issue as explained by *Landgraf.* Legisla-

---

**56.** In *Landgraf,* the right to a jury trial does not apply retroactively, despite the fact that it is a procedural provision, because this right is attached to the punitive and compensatory damages provisions, to which the presumption against retroactivity applies. *See* 511 U.S. at ——, 114 S.Ct. at 1505.

**57.** 511 U.S. at ——, 114 S.Ct. at 1506. "Before we entertained that [constitutional] question, we would have to be confronted with a statute that explicitly authorized punitive damages for preenactment conduct. The Civil Rights Act of 1991 contains no such explicit command."

**58.** The EPA's use of punitive damages is laid out in its "Superfund Enforcement Strategy and Implementation Plan," as reprinted in Alfred R. Light, *CERCLA Law and Procedure Compendium* at III–6:

As authorized under sections 106 and 107, the government will pursue cases involving treble damages and penalties for violations of unilateral and consent orders. Taking such actions is important for establishing a credible deter-

rent. These actions are available against persons who fail without sufficient cause to comply with orders.

**59.** *See* 511 U.S. at ——, 114 S.Ct. at 1506:

It does not make unlawful conduct that was lawful when it occurred; as we have noted, *supra,* at 1490–1491, § 102 only reaches discriminatory conduct already prohibited by Title VII. Concerns about a lack of fair notice are further muted by the fact that such discrimination was in many cases (although not this one) already subject to monetary liability in the form of backpay. Nor could anyone seriously contend that the compensatory damages provisions smack of a "retributive" or other suspect legislative purpose. Section 102 reflects Congress' desire to afford victims of discrimination more complete redress for violations of rules established more than a generation ago in the Civil Rights Act of 1964. As least with respect to its compensatory damages provisions, then § 102 is not in a category in which objections to retroactive application on grounds of fairness have their greatest force.

tion cannot be remedial if the conduct being "remedied" was lawful at the time of its occurrence. As discussed above, determining that a statute has "retroactive effect" is only part of the analysis; by itself, it does not indicate Congress' intent. *Northeastern's* statement about CERCLA having a "backward focus," is no more dispositive than a similar characterization of the compensatory damage provision discussed in *Landgraf.*

> Unlike certain other forms of relief, *compensatory damages are quintessentially backward-looking.* Compensatory damages may be *intended* less to sanction wrongdoers than to make victims whole, but they do so by a mechanism that affects the liabilities of defendants. They do not "compensate" by distributing funds from the public coffers, but by requiring particular employers to pay for harms they caused. The introduction of a right to compensatory damages is also the type of legal change that would have an impact on private parties' planning.

511 U.S. at ——, 114 S.Ct. at 1506. (emphasis added in first sentence only). *Landgraf* insists that in no case "in which Congress had not clearly spoken, have we read a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment." 511 U.S. at ——, 114 S.Ct. at 1507. Liability under CERCLA certainly must be in accord with this principle. The fact that "retroactive application of [this] statute would vindicate its purpose more fully", as in *Landgraf,* "is not sufficient to rebut the presumption against retroactivity." *Id.* at —— – ——, 114 S.Ct. at 1507–08.

Only one sentence in *Landgraf,* if taken in isolation, lends any support at all to Justice's position. Near the end of the opinion, *Landgraf* says: "Section 102 is plainly not the sort of provision that *must* be understood to operate retroactively because a contrary reading would render it ineffective." *Id.* at ——, 114 S.Ct. at 1508 (emphasis in original). Jus-

tice's argument boils down to a claim that CERCLA must be read to be retroactive.

Without any doubt, in CERCLA Congress is addressing an existing situation as well as future problems. In this respect, CERCLA certainly has a "backward focus." It does not follow, however, that the liability provision "must be understood to operate retroactively because a contrary reading would render it ineffective." Early on, the Justice Department itself argued, at least in the alternative, that CERCLA's liability provision need not be interpreted to be retroactive. *See Georgeoff* at 1304–1306. Quickly, however, that argument failed, but ultimately became unnecessary as courts approved of applying CERCLA retroactively. Citing certain "main policy objectives underlying CERCLA ... and the need for a liberal interpretation of the Statute, the courts have expanded the scope of CERCLA liability well beyond anything that Congress itself could have envisioned." Allan J. Topol and Rebecca Snow, 1 *Superfund Law and Procedure,* § 1.1 at 6 (West Pub.; St. Paul, Minn. 1992).

Justice confuses what it, the EPA, and a number of courts consider desirable with what it can be said Congress clearly intended. Insofar as pre-enactment releases are concerned, the purpose of CERCLA can be covered through the Superfund. The EPA, however, has chosen to recover as much as possible from private parties,[60] no doubt in part due to Congress' failure to provide sufficient resources to pay for cleaning all the sites, even as the need was thought to be in 1980. *See Georgeoff,* 562 F.Supp. at 1312–13. While *Georgeoff* takes the lack of funding as an indication of congressional intent to make CERCLA retroactive, *Id.* at 1313, lack of funding does not render the operation of the statute itself ineffective in the sense used in *Landgraf.*

■ *Landgraf* mentions accepted means such as certain taxes and zoning regulations

---

**60.** See "Superfund Enforcement Strategy and Implementation Plan" (Sept. 26, 1989) reprinted in Alfred R. Light, *CERCLA Law and Procedure Compendium* (BNA, Washington, D.C., 1992) at III–2.

EPA will consider private party responses as the preferred approach for the majority of Su-

perfund sites. At the same time, EPA will retain the maximum amount of leverage to use the Fund at specific sites where negotiations are unsuccessful. The goal of the government is to negotiate an agreement for 100% of response costs.

by which governments "impose burdens on past conduct." 511 U.S. at —— n. 24, 114 S.Ct. at 1499, n. 24.[61] Such means, if not otherwise unconstitutional, allow legislators to "remedy" past conduct. Legislators can address environmental damage; however, under the "Takings Clause," [62] "confiscatory regulations . . . cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restriction that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas v. So. Carolina Coastal Council,* 505 U.S. 1003, 1029, 112 S.Ct. 2886, 2900–01, 120 L.Ed.2d 798 (1992). As *Landgraf* observes, the "Takings Clause" is one of several constitutional provisions which incorporate the anti-retroactivity provisions. 511 U.S. at ——, 114 S.Ct. at 1497. Of course, agencies and officials at all levels of government generally would wish to induce or compel particular parties to pay for government initiatives rather than having to impose a general tax. However, the general presumption against retroactivity and particular constitutional provisions are designed to limit, and in some instances to prevent, governments from doing so.

Ironically, the EPA has resisted the retroactivity principle when it would have worked in favor of private parties. Under Section 106(b)(2)(A), added in 1986 by Superfund Amendments and Reauthorization Act ("SARA"), private parties can seek certain reimbursement from the Superfund.[63] The EPA has "adopted the position that orders issued before the passage of SARA do not provide the petitioner with a right to reimbursement against the Fund." 2 *Superfund Law and Procedure supra* § 11.1 at 272 (footnote omitted). Courts have generally agreed with the EPA position. See cases cited in *id.,* n. 7–10.

■ Nothing presented in the Justice Department brief or pre-*Landgraf* cases concerning the statutory language of CERCLA

or its legislative history demonstrates that Section 107(a) (and/or Section 106(a) as related to it in this case) is "the sort of provision that *must* be understood to operate retroactively because a contrary reading would render it ineffective." 511 U.S. at ——, 114 S.Ct. at 1508. Accordingly, this court holds that Section 107(a), and Section 106(a) as linked to it in this case are not retroactive.

## III. CONSTITUTIONAL ISSUES

The holding that Sections 106(a) and 107(a) cannot be given retroactive effect resolves much, but not all, of this case. Moreover, because of the court's statutory interpretation holding, the court need not rule on the due process constitutional issue, which applies only to pre-enactment conduct. The complaint, however, covers conduct which, while largely occurring prior to the effective date of CERCLA in 1980, includes some post-enactment conduct.[64] As the defendant mentions in its brief, the provisions of the consent decree respond "*mostly* with respect to waste disposal activities that preceded the enactment of CERCLA in 1980" (emphasis added). After briefly addressing one constitutional issue which has been mooted by the court's holding on pre-enactment conduct, the court considers more fully those constitutional issues which are not limited to pre-enactment conduct.

### A. Retroactivity and Due Process

*Landgraf* recognizes the due process and other constitutional concerns lurking in the background of the interpretive issue of whether Congress intended retroactive application. *See* 511 U.S. at —— – ——, 114 S.Ct. at 1497–98. Such constitutional considerations seem to have contributed to the Court's confirmation of the presumption against retroactivity. Yet, with the possible exception of a punitive damages provision, the Court seems to accept that Congress has

---

**61.** *See also* 511 U.S. at ——, 114 S.Ct. at 1506. ("They do not 'compensate' by distributing funds from public coffers, but by requiring particular employers to pay for harms caused.")

**62.** U.S. Constitution, Amendment V.

**63.** Section 106(b)(2)(A) provides that "[a]ny person who receives and complies with the liens of

any [Section 106(a) order] may, within 60 days after completion of the required action, petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest."

**64.** *See* Complaint ¶'s 12 and 18.

the constitutional power to give a statute retroactive effect if it clearly intends to do so. *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1499 ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights *unless* Congress has made its intent clear." (emphasis added)). Given the court's statutory interpretation of CERCLA, there is no need to reach the constitutional validity of retroactive application of CERCLA under the due process clause.

## B. Delegation of Legislative Power

The defendant contends that CERCLA unconstitutionally "delegates to EPA the basic policy decisions" with "no 'intelligible standard' to guide EPA's decisions about which contaminated sites pose significant risks and how much money should be spent to reduce or eliminate such risks." Def.'s Mem. of Law in Resp. to Ct.'s Ord. of Sept. 19, 1995 at 20–21. This constitutional challenge attacks CERCLA as generally administered by the EPA. This broader challenge based on the non-delegation doctrine has not been mooted by the holding that CERCLA liability cannot be applied retroactively.

■ The EPA's decision to apply CERCLA retroactively against private parties represents one example of what the defendant contends is the unauthorized exercise of legislative power. One way of understanding the decision in *Landgraf* is to view it as applying a specific rule of non-delegation, namely that Congress cannot leave such a basic legislative decision as a statute's possible retroactivity to the executive and judicial branches. Both the presumption against retroactivity and the non-delegation doctrine derive from the more fundamental doctrine of separation of powers. Thus, *Landgraf* cites *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in support of the proposition that "even the will of the majority does not become law unless it follows the path charted in Article I, § 7, cl. 2 of the Constitution." 511 U.S. at ——, 114 S.Ct. at 1496. *Landgraf* could also have cited *Chadha* as to what is "essentially legislative", namely Congressional "action that [has] the purpose and effect of altering the legal rights, duties, and relations of persons." 462 U.S. at 952, 103 S.Ct. at 2784–85.

*Chadha,* which is the first modern case to declare a congressional statute unconstitutional on clear separation-of-powers grounds, illustrates the relationship between the general doctrine and particular constitutional provisions. *Chadha* declares the one-house legislative veto void because it violates the bicameralism and the presentment clauses. Following *Chadha,* a line of separation-of-powers cases raise various issues, including delegation of powers and removal from office. See *Metro. Washington Airports Author. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991) (invalidating a provision in a federal statute approving an agreement for the transfer of two Washington-area airports from the U.S. Department of Transportation to an "Airports Authority," which created a "Board of Review" consisting of nine members of Congress because it violated separation of powers either by allowing members of Congress to exercise executive power or by allowing members of Congress to enact legislation without complying with the bicameralism and presentment requirements of the Constitution.); *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (finding no separation-of-powers violation in a statute establishing the United States Sentencing Commission as "an independent commission in the judicial branch of the United States" with removal by the President of commission members.); *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (finding no separation-of-powers violation in a statute providing for the appointment of "Independent Counsel" by a panel of Article III judges and removal only for cause by the Attorney General.); *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (holding that the provision in the Balanced Budget and Emergency Deficit Control Act giving executive power to the Comptroller General, who was removable by Congress, violates separation of powers).

■ In *Chadha* the dissent worried that the Court's decision threatened the "modern administrative state." See 462 U.S. at 984–89, 103 S.Ct. at 2801–04. As the post-*Chadha* cases summarized above reflect, the Court has not consistently pursued a rigor-

ous separation-of-powers approach.[65] Consequently, the modern administrative state has not been much disturbed by the line of cases cited above. A rigorous separation-of-powers approach, which would include a stricter non-delegation doctrine, would greatly curtail the rule-making authority of administrative agencies,[66] including the EPA.[67] By itself, however, a broad non-delegation constitutional challenge to CERCLA cannot currently succeed. Under present Supreme Court jurisprudence, "there is no significant 'anti-delegation' principle which restricts the exercise of the commerce power." John E. Nowak and Ronald D. Rotunda, *Constitutional Law* (St. Paul, West; 1995) at 156.

A year ago, of course, it could have been said that almost nothing restricts Congress' exercise of the commerce power. In the interim, the jurisprudence has become unsettled due to the Supreme Court's decision in *United States v. Lopez*, 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which, for the first time in more than fifty years, struck down a congressional statute which regulates non-state activity[68] on grounds that it exceeded Congress' power under the Commerce Clause. Some of the concerns raised by the defendant under the non-delegation doctrine overlap with the issues in *Lopez*, to which this court now turns.

### C. The Commerce Clause

The Supreme Court's interpretation of the Commerce Clause has expanded greatly over the better part of the last two centuries. In one pre-*Lopez* case, a federal district court described the expansion of that clause as follows:

> To be within the ambit of the Commerce Clause, an activity originally had to be commerce that moved across state lines. With time, courts began to hold that the commerce need only affect movement across state lines. Finally, courts dropped the commerce requirement and applied the Clause to any activity that affects movement across state lines. The sole remaining limitations on Congress's power under the Commerce Clause is the requirement that the effect on commerce be *substantial.*

*Michigan Protection & Advocacy Service v. Babin*, 799 F.Supp. 695, 735 (E.D.Mich.1992), *aff'd*, 18 F.3d 337 (6th Cir.1994).

Since the 1930's the Supreme Court has found very little in the Constitution that limits Congress' power to justify legislation under the Commerce Clause. Prior to *United States v. Lopez*, 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the only unsettled area appeared to involve the ability of Congress to regulate states themselves. In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) the Court held that the Commerce Clause did not give Congress power to regulate "the state as a state."[69] A few years later, the Court overturned *National League of Cities* by its decision in *Garcia v. San Antonio*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), holding that the sovereignty of the states does not limit Congress' power under

---

**65.** It is worth mentioning that the two cases in which the Court fails to find a violation of separation of powers, *Morrison* and *Mistretta*, involve statutes which give powers to the judiciary.

**66.** Professor Bernard Schwartz has written about a first draft of the *Bowsher* opinion which would have cast doubt on the constitutionality of independent agencies:

> since it virtually would have placed the Supreme Court imprimatur upon the claim that independent agencies are unconstitutional.
> . . . .
> . . . The years before *Bowsher* had seen a revival of the claim that the independent agencies were unconstitutional because, though they exercised "executed power," they were not subject to presidential control. The argument against the agencies received the support of the Reagan Department of Justice. . . .

**67.** The activities of the EPA under CERCLA include a double delegation. First, Congress has delegated to the President. Sec. 106. Then the President has delegated to EPA. (Executive Order 12580 of January 3, 1987).

**68.** *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled by *Garcia v. San Antonio Metro Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), invalidated provisions in the Fair Labor Standards Act applicable to state and local governments as exceeding Congress' power under the Commerce Clause.

**69.** The particular issue involved the application of the Fair Labor Standards Act to state and local government.

the Commerce Clause.[70] Then, somewhat inconsistently, the Court decided in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), that the Constitution does not give Congress power to "[C]ommandeer the legislative procedure of the states by directly compelling them to enact and enforce a federal regulatory program." *Id.* at 175–76, 112 S.Ct. at 2428 (quotation omitted). While the holding in *New York* did not rest on the Tenth Amendment, the Court noted that "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the states." *Id.* at 156–58, 112 S.Ct. at 2418. The application of the federalism principles found in *New York* has remained somewhat uncertain as reflected in recent federal circuit cases ruling on the Brady Bill.[71] At the same time, however, the Court has recently reaffirmed the traditional principles of state sovereignty in a case from this circuit, *Seminole Tribe of Fla. v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which rejected the principle that Congress' Commerce Clause power could be used to overrule a state's sovereign immunity.[72]

*United States v. Lopez* did not involve federal regulation of a state itself. Rather, the federal gun statute at issue attempted to exercise police power over matters historically falling within the jurisdiction of local government. In declaring Congress had exceeded its powers under the Commerce Clause in regulating non-state action, the Court seemed to open up many questions. The dissenting Justices warned that "the Court's holding threatens legal uncertainty in an area of law that, until [*Lopez*], seemed reasonably well settled." *Id.* at 514 U.S. ——, 115 S.Ct. at 1664 (Breyer, J., dissenting). The dissenters were clearly concerned that changes which occurred in landmark cases in the late 1930's and early 40's could be overturned. *Id.* at ——, 115 S.Ct. at 1665.

Despite the potential for uncertainty, the majority focused on the Constitution's limits on federal power. They emphasized that the Constitution does not grant Congress "a plenary police power that would authorize enactment of every type of legislation." *Id.* at ——, 115 S.Ct. at 1633. While a few of its cases had "taken long steps" towards granting such "a general police power of the sort retained by the states," the Court declined to follow some of the very broad language which seemed to allow Congress to do virtually anything under the Commerce Clause. *Id.* at ——, 115 S.Ct. at 1634.

Any application of *Lopez* must begin with its reassertion that the Constitution's enumeration of powers limits federal power, that such enumeration "[does] not presuppose something not enumerated." *Id.* at ——, 115 S.Ct. at 1634 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) at 195, 6 L.Ed. 23 (1824)).

Since this country's inception, the division of powers between the state and federal governments has been a constant source of friction. Indeed, that conflict was considered an important institutional protection for liberty.[73] Moreover, federal courts have been considered essential to preserving the federal state balance.[74] Thus, in performing its duty to elucidate the meaning of the Constitution

---

**70.** Again the particular issue involved the Fair Labor Standards Act.

**71.** Contrast *Koog v. United States*, 79 F.3d 452 (5th Cir., 1996) (holding the Brady Act exceeds Congress' power per *New York v. United States*, insofar as it requires local law enforcement official to administer the Act) with *Mack v. United States*, 66 F.3d 1025 (9th Cir.1995) (upholding the Brady Act against a challenge under *New York v. United States* ).

**72.** The particular case involved the Indian Commerce Clause, but the case overruled *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1988), which involved the general Commerce Clause.

**73.** *See generally* The Federalist No. 39.

**74.** *See e.g.,* The Federalist No. 44, at 233 (James Madison) (George W. Carey and James McClellan eds., 1990)

(If it be asked what is to be the consequence, in case the Congress shall misconstrue this part of the Constitution, and exercise powers not warranted by its true meaning? I answer the same as if they should misconstrue or enlarge any other power vested in them, as if the general power had been reduced to particulars, and any one of these were to be violated; the same in short, as if the State Legislatures should violate their respective constitutional authorities. In the first instance, the success of the usurpation will depend on the executive and judiciary departments, which are to expound and give effect to the legislative acts; and in the last resort, a remedy must be ob-

in such a way as to reconcile prior case law with the meaning of the Constitution itself,[75] the federal courts play an important part in maintaining federalism.

Accordingly, this court applies the principle of enumerated powers discussed in *Lopez* to the question of CERCLA's constitutionality. In so doing, this court finds that, when measured against the "ultimate touchstone of constitutionality," *Graves v. O'Keefe*, 306 U.S. 466, 491–492, 59 S.Ct. 595, 603–604, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring), the application of CERCLA *to this case* exceeds the power given Congress under the Commerce Clause.

### 1. The Constitutional Text and Its Original Interpretation

As stated in *Lopez:*

We start with first principles. The Constitution creates a Federal Government of enumerated powers. *See* U.S. Const., Art. I, § 8. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

*Lopez*, 514 U.S. at ——, 115 S.Ct. at 1626 (opinion of Rehnquist, C.J.); *see also Id.* 514 U.S. at ——, 115 S.Ct. at 1638 (Kennedy, J., concurring) ("It was the insight of the Framers that freedom was enhanced by the creation of two governments, not one").

Perhaps, "[i]t is easy to lose sight of all this in a day when Congress appropriates trillion-dollar budgets and regulates myriad aspects of economic and social life. Nevertheless, there are occasions on which we are reminded of this fundamental postulate of our constitutional order." *United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir.1993), *aff'd*, 514 U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

#### a. Enumerated Powers and the Necessary and Proper Clause

The Constitution enumerated the powers of Congress in Article I, Section 8, which begins: "The Congress shall have the Power To...." Then, in the following eighteen clauses, the text listed the powers given to Congress, including the Commerce Clause and the Necessary and Proper Clause.

From the beginning, the import of the necessary and proper clause was controver-

---

tained by the people, who can by the election of more faithful representatives, annul the acts of the usurpers.); *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 323, 4 L.Ed. 579 (1819) (Marshall, C.J.) ("[S]hould Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land."); The Federalist No. 78, at 404 (Alexander Hamilton) (George W. Carey and James McClellan eds., 1990) (referring to the courts as "the bulwarks of a limited constitution against legislative encroachments.").

**75.** "[T]he ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." *Graves v. O'Keefe*, 306 U.S. 466, 491–492, 59 S.Ct. 595, 603–604, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring). *But see*

*Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (per curiam) (dictum) (characterizing decisions of the Supreme Court as "the supreme law of the land"); *see also* Addresses and Papers of Charles Evans Hughes 133, 139 (1908) (speech to the Elmira Chamber of Commerce (May 3, 1907)) ("The Constitution is what the judges say it is.").

See also Justice Thomas' concurrence: "Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent case law and is more faithful to the original understanding of that Clause." *Id.* at 514 U.S. ——, 115 S.Ct. at 1642. In short, as the majority in *Lopez* implicitly recognized, it is our jurisprudence that must be squared with the constitution, not the other way around.

sial. In the administration of George Washington, Secretary of State Thomas Jefferson argued for a narrow or strict interpretation of the enumerated powers.[76] His views reflected those of the anti-Federalists who had opposed the Constitution, in large measure from fear of the necessary and proper clause. They desired a provision like the one in the Articles of Confederation which had limited the powers of the government to those "expressly" delegated by the states. The anti-Federalists lost this argument, even when they got the Tenth Amendment as part of the Bill of Rights, as this amendment failed to use the term "expressly." [77] In opposition to Jefferson, Alexander Hamilton—following the *Federalist*—argued for a broader interpretation of the enumerated powers, but nevertheless one within the structural constraints of the Constitution. As Hamilton had written in *The Federalist*, no one was proposing an all-powerful government; only a more powerful central government than that of the Articles of Confederation.[78]

The views of Hamilton and *The Federalist* found their way into the Marshall Court, which is hardly surprising since the Court was dominated by Federalists. The same basic Federalist viewpoint which created the text of the Constitution also interpreted that text. Moreover, Chief Justice Marshall's opinions coincided with *The Federalist* without ever citing those essays.[79] Apparently, Marshall's point was to derive meaning directly from the text and structure of the Constitution rather than to rely on a secondary source.

Marshall's opinion in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) is often referred to as giving a broad interpretation of the necessary and proper clause. In fact, *McCulloch* demonstrated that the necessary and proper clause is unnecessary. That is to say, *McCulloch* first explained how a proper interpretation of the enumerated powers supports Congress' power to create the Bank of the United States.[80] The fact that Congress did not have the power generally to create corporations (and still does not attempt to exercise such a power) did not mean it lacked the power to create a particular corporation as a means to the exercise of one or more of its clearly enumerated powers.

The necessary and proper clause in no way expanded the enumerated powers of Congress;[81] it simply left no doubt that Congress has the fullness of those powers actually granted in the Constitution. *McCulloch*, therefore, followed the explanation of the necessary and proper clause as provided in *The Federalist*, namely that it is merely "declaratory of a truth, which would have resulted by necessary and unavoidable implication from the very act of constituting a Federal Government, and vesting it with certain specified powers." *The Federalist* No. 33, at 159 (George W. Carey and James McClellan eds., 1990) (arguing further that "the constitutional operation of the intended government would be precisely the same, if [the Necessary and Proper Clause and the Supremacy Clause] were entirely obliterated, as if they were repeated in every article."). *See also*

76. See Carl B. Swisher, *American Constitutional Development* at 72–73, Riverside Press (1943).

77. The Tenth Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

78. *See generally*, The Federalist Nos. 23–36.

79. *See* J. Rakove, "Early Uses of *The Federalist*" in *Saving the Revolution* (C. Kessler, ed.) (N.Y., 1987) at 240 ("his jurisprudence and its Hamiltonian strains were independent expressions of a set of principles and beliefs that both men had long shared ... In fact, Marshall rarely made use

of *The Federalist* in his opinions.") (footnotes omitted).

80. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) at 407–408.

81. "The doctrine that Congress may provide for regulation of activities not themselves interstate commerce, but merely 'affecting' such commerce, rests on the premise that in certain fact situations the Federal government may find that regulation of purely local and intrastate commerce is 'necessary and proper' to prevent injury to interstate commerce." *Polish National Alliance of the United States of North America v. National Labor Relations Board*, (Black, J., concurring) 322 U.S. 643, 652, 64 S.Ct. 1196, 1201, 88 L.Ed. 1509 (1944).

The Federalist No. 44, at 232 (George W. Carey and James McClellan eds., 1990) ("No axiom is more clearly established in law, or in reason, than that wherever the *end* is required, the *means* are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it, is included.") (emphasis added). Echoing this reading of the text, *McCulloch v. Maryland* stated, "it may with great reason be contended, that a government, entrusted with such *ample powers,* on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with *ample means* for their execution." (emphasis added) 17 U.S. (4 Wheat.) 316, 408, 4 L.Ed. 579 (1819).

In *McCulloch,* Marshall discussed the relationship between ends and means as applied to the necessary and proper clause: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist of the letter and spirit of the constitution, are constitutional." *McCulloch,* 17 U.S. at 421. According to Chief Justice Marshall, *McCulloch* represented no augmentation of the enumerated powers. Writing in defense of the opinion under the pseudonym "A Friend of the Constitution," Marshall insisted that *McCulloch* "does not contain the most distant illusion to *any extension by construction* of the powers of congress. Its sole object is to remind us that a constitution cannot possibly enumerate the *means* by which the powers of government are to be carried into execution." [82] *McCulloch's* statement that we must remember that it is a constitution we are interpreting was not a justification for departing from the text, but an indication of how to interpret the text, i.e., not narrowly like a statute. [83] Thus, Marshall stated that a Constitution does not "partake of a prolixity of a legal code." *McCulloch,* 17 U.S. at 407.

The necessary and proper clause is like the Tenth Amendment in that both declare what the structure of the Constitution already provides. As Chief Justice Marshall and *The Federalist* say, the necessary and proper clause merely declares that the powers given to the federal government are given in their fullness. The clause does not mean—as anti-Federalists feared—that Congress can claim other powers not listed by invoking the necessary and proper clause. Accordingly, the Tenth Amendment reflects the attempt to quiet what Federalists at the time considered to be unfounded fears. Thus, "the Tenth Amendment does not independently provide a substantive limitation on the powers of the United States. Instead the Tenth Amendment simply makes plain that the federal government possesses only the powers that have been given to it by the Constitution—and no more." *Koog v. United States,* 79 F.3d at 455 (5th Cir., 1996).

### b. Marshall's Interpretation of the Commerce Clause

The power referred to as "the Commerce Clause", Article I, Section 8 provides: "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "Even to speak of 'the Commerce Clause,' perhaps obscures the actual scope of that clause because Congress did not have authority to regulate all commerce; Congress could only 'regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.' " *Lopez,* 514 U.S. at ——, n. 2, 115 S.Ct. at 1644 n. 2 (Thomas, J., concurring).

Five years after *McCulloch,* Chief Justice Marshall wrote *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) which is the classic analysis of the text of the Commerce Clause in its fullness. [84] He addressed the

---

**82.** G. Gunther, ed., John Marshall's Defense of *McCulloch v. Maryland* 185.

**83.** See discussion of *McCulloch* by Justice Story in II *Commentaries on The Constitution,* §§ 1263–70 (Cambridge; MA, 1858) (3rd ed.) at 149–161.

**84.** The language of the clause differs in its choice of prepositions to precede "foreign Nations," *i.e..* "with," and States, *i.e.,* "among". The import of the difference becomes readily apparent by using the preposition "among" to precede "foreign Nations." The power to regulate commerce "among" is a superintending power which Congress possesses vis-a-vis the states, but obviously not vis-a-vis foreign nations.

three questions which naturally follow from the language of the "power to regulate commerce among the several states." He discussed: 1) whether the subject of the congressional legislation is commerce; 2) whether the commerce affects other states; and 3) whether the legislation regulates the commerce.[85] Neither the text nor *Gibbons* use the term "interstate." As to the phrase "among the several states," *Gibbons* asks whether the commerce affects other states, not whether some *activity* affects interstate

commerce. The text and *Gibbons* ask whether the federal legislation regulates the commerce, not some activity which affects interstate commerce.[86]

## 2. Deconstruction of the Constitutional Text

The shift in focus from the text itself to a distinction between interstate and intrastate commerce came later. *Lopez* did not discuss specifically this transformation. The several opinions mentioned in *Lopez*, however, did relate that the expanded use of the Com-

---

**85.** 9 Wheat. (22 U.S.) 1, 189–197, 6 L.Ed. 23 (1824).

[The] words are, "Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

The subject to be regulated is commerce; and ... [to] ascertain the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all it branches, and is regulated by prescribing rules for carrying on that intercourse ...

. . . .

To what commerce does this power extend? The constitution informs us, to commerce "with foreign nations, and among the several states, and with the Indian tribes."

It has [been] universally admitted that these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend ...

[The] subject to which the power is next applied, is to commerce "among the several states." The word "among" means intermingled with. A thing which is among others is intermingled with them. Commerce among the states cannot stop at the external boundary line of each state, but may be introduced into the interior.

It is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states. Such a power would be inconvenient, and is certainly unnecessary.

Comprehensive as the word "among" is, it may very properly be restricted to that commerce which concerns more states than one.

The phrase is not one which would probably have been selected to indicate the completely interior traffic of a state, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power ·to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a state. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself.

. . . .

[We] are now arrived at the inquiry—What is this power?

It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution ... [If], as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States.

**86.** Justice Thomas makes a different critique of the Court's jurisprudence. He says that the "substantially affects" language so broadens Congress's power that much of Art. 1, Sec. 8 becomes "surplusage." (Thomas, J., concurring).

merce Clause began with the Interstate Commerce Act of 1887, *see* —— U.S. at ——, 115 S.Ct. at 1627, and that in reviewing congressional legislation, the Court had borrowed, inappropriately as Chief Justice Rehnquist noted, from its negative or dormant Commerce Clause jurisprudence which pertained to state legislation. *Id.*

### a. The Influence of the Dormant Commerce Clause

As is generally recognized, the early dormant commerce clause cases divided federal and state powers in analytical or categorical terms. In *Cooley v. Bd. of Wardens of the Port of Philadelphia,* 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1851), the Court drew a distinction between those things subject to national regulation and those subject to local regulation.[87] Such an approach, unlike that of Marshall,[88] was bound to fail. Under this analysis, the Court decided whether the object of regulation was or was not local. If it was "local", the Court allowed the state to regulate it; if national, states could not regulate it. Whatever merit this approach may have to analysis of state regulatory power,[89] its application to federal statutes inappropriately limited Congress. That is to say, the Court declared in some cases that Congress could not regulate things that the Court declared were "local." The Court ignored the possibility that something might be local, in the sense that a state could regulate it, without being beyond Congress' reach. This approach, epitomized later by *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), failed to acknowledge that both the state and federal governments might regulate the same commerce because even

though it was "local" in a certain sense it was also affecting other states.

The faulty framework of analysis adapted from the dormant Commerce Clause then got mixed in with the confusion between regulating commerce and exercising police powers— a distinction critical to *Lopez.* Beginning in the late 19th century a dialectual process occurred between the Court and Congress that expanded Congress' power.[90] The process began when Congress attempted to prohibit transmission by mail or importation of lottery tickets. When this failed, Congress also prohibited the transportation of lottery tickets across state lines in the 1895 Lottery Act.[91] In *Champion v. Ames* [92] (upholding the constitutionality of the Lottery Act), the Supreme Court divided over the question whether regulating the movement of lottery tickets was within congressional power or within the police power of the states. In upholding the prohibition, the majority noted that it considered the *purpose* of the Act pertinent to the constitutional question. The Court recognized a general police power in Congress to eliminate evils which threaten the general welfare.[93]

The dissent in *Champion* contended, *inter alia,* that the prohibition was not within the necessary and proper power of Congress because, while the "purpose" of the Act was the suppression of lotteries, the exercise of a general police power by the Congress conflicted with the powers reserved to the states under the Tenth Amendment.[94] In fact, the Act neither interfered with the police powers of any state nor represented a general, national police power. As the dissent itself noted, the Act did not prevent lotteries in states which chose to legalize them.[95] What

---

**87.** 12 How. (53 U.S.) at 319–320.

**88.** Although the Marshall Court did not address many Commerce Clause Cases, either active or dormant, it did address both. The Court decided *Willson v. The Black Bird Creek Marsh Co.,* 27 U.S. (2 Pet.) 245 (1829) and *Brown v. Md.,* 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827).

**89.** Whether the Constitution contains a "dormant" Commerce Clause is not an issue in this case. See Justice Scalia's argument that the Constitution does not contain a dormant commerce clause in *Tyler Pipe Industries v. Washington,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) (Scalia, J., concurring).

**90.** Much of this historical overview summarizes part of an article by John S. Baker, Jr., "Nationalizing Criminal Law: Does Organized Crime Make It Necessary or Proper?", 16 Rutgers L.Rev. 495, 521–531 (1985).

**91.** Act of March 2, 1895, ch. 191, 28 Stat. 963.

**92.** 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903).

**93.** *Id.* at 355–57, 23 S.Ct. at 326–27.

**94.** *Id.* at 365, 23 S.Ct. at 330 (Fuller, C.J., dissenting).

**95.** *Id.* at 357, 23 S.Ct. at 327.

the Act did was to prevent a seller of lottery tickets in a state where lotteries were legal from sending those lottery tickets into other states where lotteries were illegal. As a result of a previous Supreme Court decision,[96] a state on its own authority could not prohibit items from being mailed into or otherwise transported into its jurisdiction. Thus, regardless of the congressional motive or the broad dicta in the *Champion* opinion, the Lottery Act regulated a matter (cross-border movement of certain commerce) which the Court's interpretation of the dormant Commerce Clause had placed beyond the power of the states.[97] *Champion* exemplified Congress' use of the prohibiting technique to regulate, indeed to prevent, the flow of certain commerce across state lines.[98]

While the dissent in *Champion* incorrectly argued that Congress' "purpose" made the statutory prohibition improper, the majority also erred when it suggested that Congress had the power to prohibit because of its worthy purpose. The Court should have held that Congress has the power to prohibit the movement of commerce across state lines *regardless* of purpose.[99] Had this been made clear, the Court might not have later struck down the child labor laws in *Hammer v. Dagenhart*[100] based on what the majority considered to be an improper purpose. After *Champion*, however, the power to prohibit seemed to turn on the purpose.[101] Indeed, members of Congress read *Champion* as positing a national police power premised upon purpose.[102]

**96.** In *Leisy v. Hardin*, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890), the Court had prohibited states from blocking shipments of liquor into the state.

**97.** *Id.*

**98.** The sale of lottery tickets in Louisiana was local as long as restricted to the state. Once they moved across state lines, they affected other states. Congress at the time, but not the Court, understood this difference.

**99.** See *United States v. Darby*, 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941) (upholding Fair Labor Standards Act of 1938).

**100.** 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918).

**101.** Congress' purpose in passing the statute is one thing; the statute's inclusion of the word "purpose" as an element in the proof of the offense is another. Mann Act § 2, quoted *supra* note 128. As for Congress, its purpose in the sense of its motive for passing the legislation might or might not have been accurately incorporated into the purpose of the statute as evidenced by its language. Thus, although the legislative history of a statute such as the Mann Act may have reflected Congress's limited purpose, i.e., to stop the systematic enticement and interstate transportation of women for *purposes* of prostitution, proponents of the Act emphasized that its provisions did not reach prostitution or immorality "per se," but only interstate and international "white slave trade." H.R.Rep. No. 47, *supra* note 129, at 1–2, 9–11; E. Levi, *An Introduction to Legal Reasoning* 36–38 (1949).

The interpretation of the statutory language may not be limited to the legislative purpose. Thus, in *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), the Supreme Court found that the statute reflected much broader purposes. The actual language of the statute was not as limited as the legislative history would indicate, but extended to single incidents of transportation for "any immoral purpose." In *Caminetti* Justice McKenna dissented because he thought the Court's construction of the Act went beyond the purposes intended by Congress. Yet, previously, in *Hoke v. United States*, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913) he wrote the opinion upholding the Mann Act against a Commerce Clause challenge. Had Justice McKenna paid more attention to the statute itself in *Hoke*, he would have seen that its language went well beyond the congressional purposes. As an element of the offense, the word "purpose" required the prosecution to prove the defendant had a certain criminal intent. Congress' purpose in putting the word "purpose" into the statute was clear; it appeared to provide a Commerce Clause justification for purporting to prohibit the transportation of persons *within the country*. The effect of regulating persons based on their *purposes, i.e.,* motive or intent, however, was to create a "true" crime rather than a regulatory offense.

**102.** Thus, Congress thought *purpose* provided the constitutional justification for passage of the Mann (White Slave) Act. *White–Slave Traffic (Mann) Act*, ch. 395, § 2, 36 Stat. 825 (1910). After quoting from *Champion*, the House Committee Report concluded:

Certainly in the case of lotteries there is nothing harmful in the mere transportation of the pieces of paper. The injury resulted from the connection which existed between those tickets and the entire scheme of the lottery. *It was the purpose* for which the tickets were used which made them an instrument of injury to the public.

H.R.Rep. No. 47, 61st Cong., 2d Sess. 4–5 (1909).

In *Hoke v. United States*, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913), the Court analogized the aims of the Mann Act to those of the Lottery Act and the Pure Food and Drug Act. Ch. 3915,

Having facilitated the transformation of Congress' regulatory power into an implied national police power, the Court later cut back on Congress' clearly constitutional powers. In *Hammer v. Dagenhart*, the Court invalidated the congressional prohibition of the interstate transportation of goods made using child labor. The decision departed from *Champion* and other cases in that it denied Congress the power to prohibit the shipment of certain goods across state lines. The Court, however, was consistent with prior cases in the sense that, as in *Champion* and other cases, the decision turned on congressional purpose.[103]

Even Franklin Roosevelt's Justice Department viewed *Champion* and other "police power" cases in one category, set apart from the regulation of commerce.[104] The Roosevelt administration initially avoided the prohibiting commerce technique in favor of other forms of regulation based on the "affecting commerce" and "in commerce" rationales. After the Supreme Court made its famous 1937 course correction in *N.L.R.B. v. Jones & Laughlin Steel*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), Congress employed both the commerce-prohibiting technique and direct regulation based on the "affecting commerce" rationale when it enacted the 1938 Fair Labor Standards Act (FLSA). In *United States v. Darby*,[105] which upheld the Act and overruled *Hammer v. Dagenhart*, the Court approved both the prohibiting technique and direct regulation based on the "affecting commerce" rationale. Although not regulating a true crime, the FLSA made its regulations of economic relationships enforceable by criminal sanctions. The combination in *Darby* of a regulatory offense, the prohibiting *technique*, and the affecting commerce *rationale* later resulted[106] in the commingling of two lines of cases—the exercising police power cases and the regulating economic activity cases—once thought to be separate.

The coincidence in *Darby* of the prohibiting *technique*, which requires no rationale, and the "affecting commerce" *rationale*, which supports various *techniques*, did not immediately result in the expansion of federal criminal law. Although it interpreted the "affecting commerce" rationale expansively in economic matters, the Court generally took a much more restrictive view in criminal cases prior to 1970 when it decided *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). In *Perez*, various strands from the cases under the Commerce

35 Stat. 768 (1906). The Mann Act, however, differed from both because it did not actually prohibit anything or anyone from crossing state lines. Although purporting to prohibit transportation, it could not do so because it regulated persons rather than things. The Court dismissed such differences, contending that "the substance of the congressional power is the same, only the manner of its exercise must be accommodated to the difference in its objects." 227 U.S. at 323, 33 S.Ct. at 284. The Court considered the similarity of *purpose* sufficient to uphold the Mann Act under the Commerce Clause. *Id.* at 322–23, 37 S.Ct. at 283–84. Nevertheless, the difference in *means* were significant. In the Food and Drug Act, like the Lottery Act, Congress had provided for seizure of the offending articles when shipped across state lines even though the misbranded food itself was not illegal when prepared. Pure Food and Drug Act, ch. 3915, § 10, 34 Stat. 768, 771 (1906). The Mann Act did not prohibit transportation of impure or immoral things. It punished a male who had certain immoral or criminal purposes (a criminal mental element), as the object of transporting a woman across state lines.

**103.** The Court distinguished the approved congressional purposes discussed in *Champion*, *Hipolite* and *Hoke* from the economic purpose behind the child-labor legislation. *Id.* at 270–72, 38 S.Ct. at 530–31. Not only was legislation based on Congress' economic purposes more clearly constitutional than that based on moral purposes, but as Justice Holmes observed, *See* 247 U.S. at 280, 38 S.Ct. at 534 (Holmes, J., dissenting) the moral purposes prompting the child-labor legislation were certainly no less worthy than those supporting earlier congressional legislation based on Congress' economic purposes upheld by the Court. In both *Hammer v. Dagenhart*, 247 U.S. at 276, 38 S.Ct. at 532–33 ("We have neither authority nor disposition to question the motives of Congress in enacting this legislation.") voiding congressional legislation and in *Champion*, upholding congressional legislation, the Court took the same position, namely that the extension of national power—whether regulatory or police—turned on the Court's approval of Congress' purpose.

**104.** *See* n. 111, *infra.*

**105.** 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

**106.** *See Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

Clause met and merged into an expansive view of Congress' power to create criminal law. The Court upheld application of a federal "loan-shark" statute to local acts without any showing of an interstate nexus or effect.[107] The Court considered it sufficient that the activity was part of a class of activities which Congress had targeted as having affected commerce through organized crime. *Id.* at 154–56, 91 S.Ct. at 1361–62. The Court thought *Darby* to be "particularly relevant ... because it involved a criminal prosecution." [108] However, *Darby* and the cases which built on it and were cited in *Perez—Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and the public accommodations cases, *Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964),—were not criminal cases, even though indictments for regulatory offenses may have been involved.

### b. United States v. Lopez

As observed above,[109] the majority in *Lopez* recognized the uncertainty unleashed upon the lower courts left to reconcile that case with other Commerce Clause cases. In reopening debate on issues once thought foreclosed, the majority opinion in *Lopez* walks a fine line between two different views expressed by justices who, while joining the opinion, also write concurring opinions. Two of the justices "counsel[ ] great restraint," —— U.S. at ——, 115 S.Ct. at 1634 (Kennedy, J., concurring), but one justice would "reconsider our 'substantial effects' test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting our more recent Commerce Clause jurisprudence." *Id.* at —— – ——, 115 S.Ct. at 1642–43 (Thomas, J., concurring). While the Court's opinion may represent a moderate position among the justices in the majority, the dissenters consider the decision "radical." *Id.* at ——, 115 S.Ct. at 1651 (Stevens, J., dissenting) ("I also agree with JUSTICE SOUTER's exposition of the radical character of the Court's holding.").

In one Eleventh Circuit case applying *Lopez*, that court concluded that, under the Commerce Clause, Congress possesses the power to enact the Freedom of Access to Clinic Entrances Act of 1994, Pub.L. No. 103–259, 1098 Stat. 694 (1994) (codified at 18 U.S.C. § 248). *See Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995). The Eleventh Circuit found support for Congress' conclusion that the "access act regulates activity which 'substantially affects' interstate commerce." 55 F.3d at 1520. In upholding the Access Act, it was not necessary to go beyond a very narrow reading of *Lopez*. That is to say, *Cheffer* involved a criminal statute, like the gun statute in *Lopez*; but unlike the gun statute, Congress had made findings that the activity regulated by the Access Act "substantially affects interstate commerce." The court accepted those findings as persuasive.

The Justice Department narrowly views *Lopez* as applying only to the facts of the Gun Free Schools Act.[110] Only wishful thinking, however, can lead to the conclusion that the holding of *Lopez* is applicable only to schools or guns-in-schools cases. *Lopez* could have chosen a narrower approach. *Lopez* could have narrowly limited its holding to federal criminal statutes under the Commerce Clause that involve no "substantial effect" on interstate commerce. It did not do so. Had *Lopez* taken such an approach, *Cheffer* need not have been decided any differently. More importantly, such a narrowed approach would not have opened to debate the fundamental turn taken in the late 1930s jurisprudence under the Commerce Clause, which the dissenters took pains to defend. As previously noted, until *Perez v. United States* in 1971, the Supreme Court did not actually confront the application of the post–1937 Commerce Clause jurisprudence to federal criminal statutes. Before and even since, the Court has tended toward narrow construction of federal criminal statutes, thereby avoiding constitutional issues of federalism. *See e.g., United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). *Lopez* could have, but

---

**107.** 402 U.S. at 154–157, 91 S.Ct. at 1357.

**108.** *Id.* at 152–53, 91 S.Ct. at 1360–61.

**109.** See p. 1522, *supra*.

**110.** *See* Tr. of Hr'g at 4.

did not, reach the result it did by disapproving *Perez* without thereby calling into question anything else about Commerce Clause jurisprudence from 1937 to 1971.[111]

Instead, *Lopez* relies on *Perez* to categorize Commerce Clause cases as being divided into three: "First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relationship to interstate commerce." *Id.* at ——— ———, 115 S.Ct. at 1629–30 (citations omitted). Like *Lopez,* see *Id.* at ——— ———, 115 S.Ct. at 1629–30, this particular case involves only the third of these categories.

In discussing the third category, the Court repeatedly refers not simply to regulating activities which have a substantial effect on interstate commerce but to "regulating *economic* activity" which has a substantial effect on interstate commerce.

> Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce. *Lopez,* 514 U.S. ——, 115 S.Ct. at 1630.

In requiring that the object of the regulation, which "substantially affects" interstate commerce, must itself be "economic activity," (*i.e.,* commerce) rather than merely "activities," the Court is being more faithful to Chief Justice Marshall's explanation in *Gibbons v. Ogden. See* text accompanying n. 83.

▪ *Lopez* also discusses and refutes the reasoning advanced by the government for justifying Congressional action in that case. The court found the government's "cost of crime" and "national productivity" rationales to be incorrect, because, under such reasoning, Congress could regulate any activity that might lead to violent crime or any activity affecting the economic productivity of individual citizens, "regardless of how tenuously [these activities] relate to interstate commerce." *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1632. By demonstrating how the inherent logic of certain rationales fails to place any meaningful limits on congressional authority, *Lopez* requires that there be a genuine causal connection between the regulated activity and interstate commerce. In so doing, the Court is being more faithful to Chief Justice Marshall's ends/means analysis in *McCulloch. See* n. 81 and accompanying text. In other words, the *assumption* that the regulation of any activity which has a substantial effect on interstate commerce is automatically "necessary and proper" is not appropriate under *Lopez.* Thus, the *Lopez* majority criticizes the dissent for their willingness to gloss over the tenuous connection between gun possession at a school and interstate commerce. As Chief Justice Rehnquist notes, "depending upon the level of generality, any activity can be looked upon as commercial." *Lopez,* 514 U.S. ——, 115 S.Ct. at 1633 (Rehnquist, C.J.). Such reasoning, "lacks any real limits," *id.,* and would lead to the acceptance of a general police power at the federal level. *Id.* at ——, 115 S.Ct. at 1634. *See also Northern Securities Co. v. United States,* 193 U.S. 197, 402–403, 24 S.Ct. 436, 468–69, 48 L.Ed. 679 (1904) ("Commerce depends upon population, but Congress could not, on that ground, undertake to regulate marriage and divorce. If the act before us is to be carried out according to what seems to be the logic of the argument for the government ... I can see no part of the conduct of life with which, on similar principles, Congress might not interfere").[112]

---

**111.** A prominent "New Deal" advocate, Robert Stern, has written about *Perez* as being unrelated to the interpretation of the Commerce Clause put forth to justify 1930's economic legislation: "Even a lawyer who fought for a realistic interpretation which would recognize that in commercial matters the United States was one nation finds himself surprised at where we are now—

and at how readily the recent expansion is accepted." Robert Stern, *The Commerce Clause Revisited: The Federalization of Intrastate Crime,* 15 Ariz.L.Rev. 271, 284 (1973).

**112.** *Accord Maryland v. Wirtz,* 392 U.S. 183, 204–205, 88 S.Ct. 2017, 2027–28, 20 L.Ed.2d 1020 (1968) (Douglas, J., dissenting). Noting that

Finally, the above discussion is devoted to what *Lopez* says; however, that case is also noteworthy for what it fails to say. The ease with which the Supreme Court might have upheld the Gun–Free Schools Act of 1990 is striking. This point was not lost on the dissenting justices. The Court might have held that guns are articles of commerce that can be used to restrain commerce. 514 U.S. at ——, 115 S.Ct. at 1651 (Stevens, J., dissenting). It did not. The Court could have aggregated "the effect of all guns possessed in or near schools[.]" *Id.* at ——, 115 S.Ct. at 1658 (Breyer, J., dissenting) (citing *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 89–90); *see id.* at ——, 115 S.Ct. at 1651 (Stevens, J., dissenting). It did not do this either. The Court also might have considered whether Congress could have had a rational basis for concluding that the "regulated activity sufficiently affected interstate commerce."[113] *Id.* at ——, 115 S.Ct. at 1658 (Breyer, J., dissenting). Again, the court would have none

of this.[114] *See Lopez* at ——, 115 S.Ct. at 1630–34.

### 3. Application of *Lopez* to CERCLA

 Thus *Lopez* requires 1) that the statute itself regulate economic activity, which activity "substantially affects" interstate commerce. *Id.* at ——, 115 S.Ct. at 1630; and 2) that the statute include a "jurisdictional element which would ensure, through case-by-case inquiry, that the [statute] in question affects interstate commerce." *Id.* —— U.S. at ——, 115 S.Ct. at 1631. In applying *Lopez* to this case, the court finds it doubtful that the object of regulation *in this case* is "economic activity," i.e., "commerce," as that term is used in *Lopez*. It is true that at one point the defendant operated two plants, which are the focus of this litigation, and that these plants were surely engaged in "economic activity." These two plants, however, no longer operate and have not since 1982, long before this litigation was initiated.

(Frankfurter, J.).

---

113. While the majority in *Lopez* does not utilize the rational basis test, it does mention it, albeit in the context of warning against granting Congress too much deference in deciding the extent of its authority under the Commerce Clause. *See Lopez*, —— U.S. at ——, n. 2, 115 S.Ct. at 1629, n. 2 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce, does not necessarily make it so.") (*quoting Hodel v. Virginia Surface Mining and Reclamation Assos. Inc.*, 452 U.S. 264, 311, 101 S.Ct. 2389, 2391–92, 69 L.Ed.2d 1) (Rehnquist, J., concurring in judgment); ("Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of the Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only be this Court.") (*quoting Heart of Atlanta Motel*, 379 U.S. at 273, 85 S.Ct. at 366) (Black, J., concurring)." *See also* n. 72, *supra*.

114. In addition, the majority might have asked, but did not, whether Congress could have found that gun violence around schools creates a commercial problem, *Lopez* at ——, 115 S.Ct. at 1659 (Breyer, J., dissenting), or perhaps a serious economic threat to "consequently inadequately educated workers who must endure low paying jobs" and to communities and businesses that might otherwise gain from a well-educated work force. *Id.* at ——, 115 S.Ct. at 1661 (Breyer, J., dissenting).

---

state government itself is an enterprise that has a substantial effect on interstate commerce, the Justice Douglas stated that the logic of the case would lead to the conclusion that "the National Government could devour the essentials of state sovereignty, though that sovereignty is attested to by the Tenth Amendment." *Id.* at 205, 88 S.Ct. at 2028. *See also A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935).

> There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion in the outer rim is communicated perceptibly, though minutely, to recording instruments at the centre. A society such as ours "is an elastic medium which transmits all tremors through its territory; the only question is of their size." Per Learned Hand, J., in the court below. The law is not indifferent to considerations of degree. Activities local in their immediacy do not become interstate and national because of distant repercussions.

(Cardozo, J., concurring); *Polish National Alliance of the United States of North America v. National Labor Relations Board*, 322 U.S. 643, 650, 64 S.Ct. 1196, 1200, 88 L.Ed. 1509 (1944).

> The interpenetrations of modern society have not wiped out state lines. It is not for us to make inroads upon our federal system either by indifference to its maintenance or excessive regard for the unifying forces of modern technology. Scholastic reasoning may prove that no activity is isolated within the boundaries of a single state, but that cannot justify the absorption of legislative power over every activity.

Arguably, this case might be somewhat different if the government were attempting to regulate a functioning facility. Although, the complaint includes an allegation about threatened releases, the fact remains that this suit seeks clean-up of real property. While environmental degradation generally may have an effect on interstate commerce, it is not clear to this court that the degradation at issue in this case is necessarily "economic activity" or that it has a "substantial effect" on interstate commerce. It is clear to this court that the law regulating real property has been traditionally a local matter falling under the police power of the states.[115]

■ Given that *Lopez* does not limit its holding to criminal cases,[116] the government must demonstrate that its use of CERCLA is limited to the regulation of economic activity, *i.e.*, commerce, which "substantially affects" interstate commerce. Congress (or the Executive on behalf of Congress) may *regulate* economic activity which falls within the local police power, but it cannot exercise a general police power. It appears to this court that CERCLA generally represents an example of the kind of national police power rejected by *Lopez*. It is not necessary, however, for this court to reach such a conclusion, because—at least in this case—the application of CERCLA fails to meet the second criteria of *Lopez*.

Even if the application of CERCLA to the facts of this case does generally meet the first test of regulating intrastate economic activity which substantially affects interstate commerce, it must also be shown that the statute has a "jurisdictional element which would ensure, through case-by-case inquiry, that the [statute] in question affects interstate commerce." —— U.S. at ——, 115 S.Ct.

at 1631. Nothing in the statute provides for such a case-by-case inquiry. Nevertheless, assuming it had such a provision, the particular inquiry in this case clearly demonstrates that the activity in question has virtually no effect on interstate commerce. As demonstrated in the remedial investigative report, any contaminants still at Site 1 affect groundwater mostly by migrating through the locally-contained alluvial aquifer. This aquifer lies atop a miocene aquifer. The remedial-investigation report indicates there is little or no migration between the two aquifers, and there is no evidence that contaminants at Site 1 travel across state lines.

Accordingly, this court holds that EPA's attempt in this case to apply CERCLA liability against the defendant would exceed the power of Congress under the Commerce Clause.

## IV. CONCLUSION

For the reasons set forth above, the federal government has no constitutional authority to do what it proposes at Site 1. The court therefore has no authority to sign or enter the proposed consent decree and hereby **DENIES** the motion [117] to do so.

Because the court has reached this conclusion, there is no conceivable remedy to which the plaintiff would be entitled to under the complaint. This action is therefore **DISMISSED** with prejudice.

SO ORDERED.

---

**115.** *See e.g., United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 591, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973) ("Even when federal general law was in its heyday, an exception was carved out for local laws of real property.") (Burger, C.J.); *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 155, 64 S.Ct. 474, 480, 88 L.Ed. 635 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state."); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 241–242, 104 S.Ct. 2321, 2329–30, 81 L.Ed.2d 186 (1984) ("Regulation of [land]

oligopoly and the evils associated with it is a classic exercise of the State's police powers.").

It is also worth mentioning that Congress agrees that reduction, control, and the prevention of pollution, and the collection and disposal of solid waste, are all the primary responsibility of state and local governments. *See e.g.,* 42 U.S.C. § 7401(a)(3) (Clean Air Act); 42 U.S.C. § 6901(a)(4) (Resource Conservation and Recovery Act); 33 U.S.C. § 1251(b) (Federal Water Pollution and Control Act).

**116.** *See* text accompanying n. 111.

**117.** Tab 3.